Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW LICHTER, derivatively on behalf of ZUORA INC., <br><br> Plaintiff, <br><br> v. <br><br> TIEN TZUO, TYLER SLOAT, PETER FENTON, KENNETH A. GOLDMAN, TIMOTHY HALEY, JASON PRESSMAN, MICHELANGELO VOLPI, and MAGDALENA YESIL, <br><br> Defendants, <br><br> and <br><br> ZUORA INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Andrew Lichter ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Zuora, Inc. ("Zuora" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Tien Tzuo, Tyler Sloat, Peter Fenton, Kenneth A. Goldman, Timothy Haley, Jason Pressman, Michelangelo Volpi, and Magdalena Yesil (collectively, the "Individual Defendants," and together with Zuora, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zuora, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zuora, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zuora's directors and officers from April 12, 2018 through the present (the "Relevant Period").

2.     Zuora is a technology company specializing in cloud-based software that allows businesses to offer subscription services in a digital format. This is part of the subscription service business model, wherein access to services, rather than a discrete unit of products or services, is sold to customers.

3.     Zuora has two primary products: Zuora Billing ("Billing"), a subscription billing software, and Zuora RevPro ("RevPro"), a revenue recognition software. While Billing was a 'home-

grown' solution created by Zuora, RevPro was a part of the Company's acquisition of Leeyo Software, Inc. ("Leeyo") in May 2017.

4.      The Company was incorporated in Delaware as a private company in 2006, beginning operations at its San Mateo headquarters in 2007. On April 12, 2018, Zuora filed its IPO Prospectus with the SEC on Form 424B4 (the "Prospectus"), confirming its plans to become a public company. The Prospectus listed several boilerplate warnings of potential risks to the Company, including, *inter alia*, the possibility that: (i) the Company's salesforce would fail to achieve the effectiveness needed to sustain growth; (ii) the Company may fail to sufficiently or efficiently incorporate its acquisitions (most prominently RevPro) into its core operations; and (iii) the market for RevPro would dry up after the deadline for implementing Accounting Standards Update ("ASU") 2014-09 for revenue recognition.

5.      In the following fiscal year of 2019 ended January 1, 2019, all quarterly reports filed by the Company on Form 10-Qs and the annual report filed on Form 10-K failed to admit that these 'potential' risks were already problems that had begun to affect Zuora's business. For example, during a conference call held on August 30, 2018, well into the 2019 fiscal year, Defendant Tzuo unambiguously denied an analyst's concerns that RevPro's market demand would flag after the ASU 2014-09 deadline, stating that management "actually knows it has legs" to sell beyond that timeframe.

6.      On March 21, 2019, Zuora even issued a press release forecasting its fiscal year 2020 revenue guidance for a lofty range of $289 million to $293.5 million.

7.      The Company's annual report filed on Form 10-K with the SEC on April 18, 2019 (the "2019 10-K"), repeated the financial results and projections from the March 21, 2019 press release. The 2019 10-K also repeated the three 'potential' risk factors that the Company had listed in the Prospectus.

8.      However, on May 30, 2019, Zuora lowered its revenue guidance by $15.5-$21 million from its previous range to $268-278 million for the 2020 fiscal year.

9.      On this news, the price per share of Zuora stock dropped almost 30% ($5.91) from its closing price of $19.90 on May 30, 2019 to close at $13.99 the next trading day, on May 31, 2019. The price of the Company's shares continued to drop over the next trading session, decreasing by an additional $0.63 to close at $13.26 on June 3, 2019.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (2) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (3) this deferral of RevPro's integration would significantly and adversely affect the Company; (4) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (5) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. Meanwhile, four of the Individual Defendants were engaged in insider sales, netting proceeds of over $38.8 million.

12.     In light of the Individual Defendants' misconduct, which has subjected Zuora, its President and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial

likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Zuora's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.     Venue is proper in this District because Zuora and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Zuora common stock. Plaintiff has continuously held Zuora common stock at all relevant times.

### Nominal Defendant Zuora

22.     Zuora is a Delaware corporation with its principal executive offices at 3050 South Delaware Street, Suite 301, San Mateo, California, 94403. Zuora's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ZUO."

23.     The Company has two classes of common stock, which have different voting power. Class A common stock, which were issued for the Company's first round of funding, are worth one vote and trade on the NYSE. Class B common stock are worth ten votes and do not trade on any market in this form, but these stocks convert to Class A common stock when they are traded.

### Defendant Tzuo

24.     Defendant Tien Tzuo ("Tzuo") co-founded Zuora in 2007 and has served as the Company's CEO and as a director since its inception. According to the Company's Schedule 14A filed with the SEC on May 8, 2019 (the "2019 Proxy Statement"), as of March 31, 2019, Defendant Tzuo beneficially owned 21,401,650 shares[1] of the Company's common stock, which represented 25.6% of the Company's voting power on that date. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019[2] was $20.03, Tzuo owned approximately $200.6 million worth of Zuora stock.

25.     For the fiscal year ended January 31, 2019, Defendant Tzuo received $2,996,581 in compensation from the Company. This included $350,000 in salary, $2,453,636 in option awards, $178,720 in non-equity incentive plan compensation, and $14,225 in other compensation.

26.     The Company's 2019 Proxy Statement stated the following about Defendant Tzuo:

---

[1] For each Individual Defendant, beneficial stock ownership represents the value of the total number of shares held, including Class A and Class B common stock. Though Class B common stock may not be traded, Class B common stock may be traded (and thereby converted to Class A stock) at any time.

[2] This date represents the closing price of the Company's stock on the last day of trading prior to March 31, 2019.

Verified Shareholder Derivative Complaint

*Tien Tzuo* has served on our Board of Directors and as our Chief Executive Officer since November 2007 and as the Chairman of our Board of Directors since December 2017. Prior to joining us, Mr. Tzuo served as Chief Strategy Officer at salesforce.com, inc., a provider of customer relationship management software, from 2005 to 2008, and as Chief Marketing Officer from 2003 to 2005. Mr. Tzuo holds a B.S. in electrical engineering from Cornell University and an M.B.A. from Stanford University. We believe that Mr. Tzuo is qualified to serve on our Board of Directors because of the industry perspective and experience that he brings as our founder, Chairman of our Board of Directors, and Chief Executive Officer.

**Defendant Sloat**

27.     Defendant Tyler Sloat ("Sloat") has served as Zuora's CFO since 2010.

28.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sloat made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 5, 2018 | 344,009 | $ 26.10 | $ 8,978,635 |
| March 26, 2019 | 364,528 | $ 20.04 | $ 7,305,141 |
| March 28, 2019 | 35,472 | $ 20.00 | $ 709,440 |

Thus, in total, before the fraud was exposed, he sold 744,009 Company shares on inside information, for which he received approximately $17 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

29.     The Company's website states the following about Defendant Sloat:[3]

Tyler Sloat joined Zuora's executive management team as CFO in 2010 with more than fifteen years of experience in executive finance roles for payment, software and hardware technology companies varying in size from start-up to Fortune 500.

Prior to Zuora, Sloat was the Chief Financial Officer for Obopay (2007-2010), where he was responsible for all finance, accounting, treasury operations and business intelligence functions. Sloat was integral in raising well over $100M in investment and strategic capital, forming global commercial relationships with the likes of Nokia, MasterCard and Societe Generale, and deploying Obopay's mobile payment service in four countries spanning three continents.

---

[3]*See* https://www.zuora.com/about/team/. Last visited August 2, 2019.

Before Obopay, Sloat was the Controller of the Emerging Products Group at Network Appliance, Inc. (2005-2007), a position he was promoted to after the successful acquisition of Decru by Network. As Controller of Decru, Sloat reported to the CEO and owned all finance, sales operations and product operations functions.

Sloat is a registered C.P.A. (inactive) in the State of California, has an M.B.A. from the Stanford Graduate School of Business and has a B.A. from Boston College.

**Defendant Fenton**

30.     Defendant Peter Fenton ("Fenton") has served as a Company director since December 2007. He also serves as a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Fenton beneficially owned 7,791,086 shares of the Company's common stock, which represented 20.9% of the Company's voting power on that date. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03, Fenton owned approximately $156 million worth of Zuora stock.

31.     The Company's 2019 Proxy Statement stated the following about Defendant Fenton:

*Peter Fenton* has served as a member of our Board of Directors since December 2007. Since 2006, Mr. Fenton has served as a General Partner of Benchmark Capital Partners, a venture capital firm. From 1999 to 2006, Mr. Fenton served as a Managing Partner at Accel Partners, a venture capital firm. Mr. Fenton currently serves on the board of directors of Cloudera, Inc., Elastic N.V., New Relic, Inc., and several private companies. Mr. Fenton also served on the Boards of Directors of Twitter, Inc. from February 2009 to May 2017, Zendesk, Inc. from March 2015 to November 2017, Hortonworks, Inc. from July 2011 to January 2019, and Yelp, Inc. from September 2006 to March 2019. Mr. Fenton holds a B.A. in philosophy and an M.B.A. from Stanford University. We believe Mr. Fenton is qualified to serve as a member of our Board of Directors because of his extensive experience in the venture capital industry, his knowledge of technology companies, and his service on the boards of directors of various public and private companies.

**Defendant Goldman**

32.     Defendant Kenneth A. Goldman ("Goldman") has served as a Company director since February 2016. He also serves as Chair of the Audit Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Goldman beneficially owned 231,058 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03, Goldman owned approximately $4.6 million worth of Zuora stock.

33.     For the fiscal year ended January 31, 2019, Defendant Goldman received $187,483 in compensation from the Company. This included $37,500 in fees earned or cash paid, and $149,983 in stock awards.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Goldman made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|-----------------|-------|----------|
| March 26, 2019 | 35,000 | $ 19.92 | $ 697,200 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

35.     The Company's 2019 Proxy Statement stated the following about Defendant Goldman:

*Kenneth A. Goldman* has served as a member of our Board of Directors since February 2016. Mr. Goldman has served as the President of Hillspire LLC, a wealth management service provider, since September 2017. From October 2012 to June 2017, Mr. Goldman served as the Chief Financial Officer of Yahoo! Inc. Prior to this, Mr. Goldman was the Senior Vice President and Chief Financial Officer of Fortinet Inc., a provider of threat management technologies, from 2007 to 2012. From 2006 to 2007, Mr. Goldman served as Executive Vice President and Chief Financial Officer of Dexterra, Inc., a mobile enterprise software company. From 2000 until 2006, Mr. Goldman served as Senior Vice President of Finance and Administration and Chief Financial Officer of Siebel Systems, Inc. From January 2015 to December 2017, Mr. Goldman served as a member of the PCAOB, Standing Advisory Group. Mr. Goldman currently serves on the board of directors of GoPro, Inc., NXP Semiconductor N.V., TriNet Group, Inc., RingCentral, Inc. and several private companies. Mr. Goldman is also on the board of directors of the SASB (Sustainability Accounting Standard Board) Foundation, which is responsible for the financing, oversight, administration and appointment of the SASB Standard Board. In addition, he is a Trustee Emeritus on the board of trustees of Cornell University. Mr. Goldman holds a B.S. in electrical engineering from Cornell University and an M.B.A. from Harvard Business School. We believe Mr. Goldman is qualified to serve as a member of our Board of Directors based on his experience serving on the boards of directors of numerous companies, his extensive executive experience, and his prior experience as a member of the Financial Accounting Standards Advisory Council and the PCAOB's Standing Advisory Group.

**Defendant Haley**

36.     Defendant Timothy Haley ("Haley") has served as a Company director since October 2010. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Haley beneficially owned 3,109,032 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03, Haley owned approximately $62.27 million worth of Zuora stock.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Haley:

*Timothy Haley* has served as a member of our Board of Directors since October 2010. Mr. Haley is a Managing Director at Redpoint Ventures, a venture capital firm, which he co-founded in 1999. Prior to co-founding Redpoint Ventures, Mr. Haley was a Managing Director of Institutional Venture Partners, a venture capital firm. From 1986 to 1998, Mr. Haley was the President of Haley Associates, an executive recruiting firm in the high technology industry. Mr. Haley currently serves on the board of directors of Netflix, Inc., 2U, Inc., and several private companies. Mr. Haley is also on the Board of Trustees of Santa Clara University. Mr. Haley holds a B.A. in philosophy from Santa Clara University. We believe that Mr. Haley brings strategic and financial experience to the Board of Directors. He has evaluated, invested in, and served as a board member on numerous companies. His executive recruiting background also provides the Board of Directors with insight into talent selection and management.

**Defendant Pressman**

38.     Defendant James C. Pressman ("Pressman") has served as a Company director since November 2008. He also serves as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Pressman beneficially owned 2,805,074 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03, Pressman owned approximately $56 million worth of Zuora stock.

39.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pressman made the following sales of Company stock, and made no purchases of Company stock:

Verified Shareholder Derivative Complaint

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 17, 2018 | 1,050 | $ 17.87 | $ 18,764 |
| March 26, 2019 | 1,040 | $ 19.76 | $ 20,550 |

Thus, in total, before the fraud was exposed, he sold 2,090 Company shares on inside information, for which he received approximately $39,314. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

40.    The Company's 2019 Proxy Statement stated the following about Defendant Pressman:

*Jason Pressman* has served as a member of our Board of Directors since September 2008. Mr. Pressman is a Managing Director at Shasta Ventures, a venture capital firm, where he has worked since 2005. Prior to Shasta Ventures, Mr. Pressman served as a Vice President of Strategy and Operations at Walmart.com, a subsidiary of Wal-Mart Stores, Inc., a worldwide retailer, from 2000 to 2004. Mr. Pressman is currently a member of the board of directors of several private companies. Mr. Pressman holds a B.S. in finance from the University of Maryland, College Park and an M.B.A. from Stanford University. We believe that Mr. Pressman is qualified to serve on our Board of Directors because of his operations and strategy experience gained from the retail industry and for his corporate finance expertise gained in the venture capital industry serving on boards of directors of various technology companies.

**Defendant Volpi**

41.    Defendant Michelangelo Volpi ("Volpi") has served as a Company director since November 2011. He also serves as a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Volpi beneficially owned 1,428,157 shares of the Company's common stock, which represented 3.9% of the voting power for the Company. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03, Volpi owned approximately $28.6 million worth of Zuora stock.

42.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Volpi made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 5, 2018 | 28,780 | $ 26.52 | $ 763,246 |
| December 11, 2018 | 137,629 | $ 18.66 | $ 2,568,157 |
| December 12, 2018 | 563,941 | $ 18.77 | $ 10,585,173 |
| December 13, 2018 | 44,800 | $ 18.44 | $ 826,112 |
| December 14, 2018 | 23,471 | $ 18.32 | $ 521,589 |
| December 19, 2018 | 95,398 | $ 18.22 | $ 1,738,152 |
| December 20, 2018 | 39,762 | $ 18.26 | $ 726,054 |
| January 4, 2019 | 161,116 | $ 18.43 | $ 2,969,368 |
| March 26, 2019 | 19,187 | $ 19.48 | $373,763 |

Thus, in total, before the fraud was exposed, he sold 1,119,084 Company shares on inside information, for which he received approximately $21 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

43.     The Company's 2019 Proxy Statement stated the following about Defendant Volpi:

*Michelangelo Volpi* has served as a member of our Board of Directors since November 2011. Mr. Volpi is a Partner at Index Ventures, a venture capital firm, where he has worked since 2009. From 2007 to 2009, Mr. Volpi served as Chief Executive Officer of Joost N.V., an internet video services company. From 1994 to 2007, Mr. Volpi served in various executive roles at Cisco Systems, Inc., a technology company, including as Senior Vice President and General Manager, Routing and Service Provider Group and as Chief Strategy Officer. Mr. Volpi currently serves on the board of directors of Elastic N.V., Fiat Chrysler Automobiles N.V., Sonos, Inc., and several private companies. Mr. Volpi also served on the Boards of Directors of Hortonworks, Inc. from October 2011 to January 2019, and Pure Storage, Inc. from April 2014 to October 2018. Mr. Volpi earned a B.S. in mechanical engineering, an M.S. in manufacturing systems engineering, and an M.B.A. from Stanford University. Mr. Volpi's qualifications for board service include his leadership experience, expertise as a venture capital investor, knowledge regarding the enterprise technology industry, and his service on the boards of directors of numerous public and private companies.

**Defendant Yesil**

44.     Defendant Magdalena Yesil ("Yesil") has served as a Company director since May 2017. She also serves as Chair of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Yesil beneficially owned 157,204 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03, Yesil owned approximately $3.15 million worth of Zuora stock.

45.     For the fiscal year ended January 31, 2019, Defendant Yesil received $189,358 in compensation from the Company. This included $37,500 in fees earned or cash paid, and $149,983 in stock awards.

46.     The Company's 2019 Proxy Statement stated the following about Defendant Yesil:

*Magdalena Yesil* has served as a member of our Board of Directors since May 2017. She is the Executive Chair of Informed, Inc., d/b/a DriveInformed, a software company serving the auto lending industry, since April 2016. In 2010, Ms. Yesil co-founded Broadway Angels, an angel investment group. Ms. Yesil was also an early investor in salesforce.com, inc. and served on that company's board of directors for more than five years. She was a General Partner at U.S. Venture Partners, a venture capital firm, from 1998 to 2006. Ms. Yesil founded MarketPay Associates, L.L.C., a software company, and served as its Chief Executive Officer and President from 1996 to 1997. Ms. Yesil co-founded and served as Vice President of Marketing and Technology of CYCH, Inc. (f/k/a CyberCash, Inc.), a secure electronic payment company. Ms. Yesil currently serves on the board of directors of Smartsheet Inc. and several private companies. Ms. Yesil also served on the Board of Directors of RPX Corporation from March 2017 to June 2018. Ms. Yesil received a B.S. in industrial engineering and management science and an M.S. in electrical engineering from Stanford University. We believe Ms. Yesil is qualified to serve as a member on our Board of Directors based on her extensive experience as an investor in the technology industry, as a founder of multiple technology companies, as well as her public and private company board experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.     By reason of their positions as officers, directors, and/or fiduciaries of Zuora and because of their ability to control the business and corporate affairs of Zuora, the Individual Defendants owed Zuora and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zuora in a fair, just, honest, and equitable

manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zuora and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Zuora and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zuora, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Zuora were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zuora, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zuora's Board at all relevant times.

52.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its

regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of Zuora were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zuora were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zuora's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zuora conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zuora and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zuora's operations would comply with all applicable laws and Zuora's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.     Each of the Individual Defendants further owed to Zuora and the shareholders the duty of loyalty requiring that each favor Zuora's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Zuora and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, and directorial positions with Zuora, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zuora.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a)of the Exchange Act.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Zuora, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zuora and was at all times acting within the course and scope of such agency.

## **ZUORA'S CODE OF CONDUCT**

63.     The Company's Global Code of Business Conduct and Ethics (the "Code of Conduct"), states that it "applies to every member… of the Board of Directors (the 'Board'), officer, employee, independent contractor and consultant of Zuora…"

64.     The Code of Conduct provides, under the section titled, "Responsibility," that the Company strives for high ethical standards, especially of honesty and integrity, stating that:

> This Code cannot address every ethical issue or circumstance that may arise, so, in complying with the letter and spirit of this Code, employees must apply common sense, together with high personal standards of ethics, honesty and accountability, in making business decisions where this Code has no specific guideline. In complying with this Code, employees should also consider the conduct of their family members and others who live in their household.

In addition, each employee is expected to comply with all other Zuora policies and procedures that may apply to employees, many of which supplement this Code by providing more detailed guidance. Zuora may modify or update these specific policies and procedures from time to time, and adopt new policies and procedures in the future.

Zuora expects all of its directors, executives, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to Zuora to help foster a sense of commitment to this Code among all of its employees, and to foster a culture of fairness, honesty and accountability within Zuora.

65.     The Code of Conduct provides that the Company not only prioritizes legal compliance, but that it considers it only the beginning of an employee's duties:

Zuora's success depends upon each employee performing his or her duties to Zuora in compliance with applicable laws and in cooperation with governmental authorities. Zuora's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that each employee knows and understands the legal and regulatory requirements that apply to Zuora's business and to his or her specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If any directors have any question in the area of legal compliance, he or she should approach the Chair (or, in the case of the Chair, Zuora's Compliance Officer), and if any employees have any questions in the area of legal compliance, they should approach their supervisor or Zuora's Compliance Officer immediately.

Legal compliance is only a part of Zuora's ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct. Zuora strives to act with the utmost integrity, not just in its most important corporate decisions, but also in the actions taken every day by its employees and directors. Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help Zuora become a better company, a better commercial partner for other companies, and a better corporate citizen.

66.     The Code of Conduct also provides that insider trading is illegal and unethical, directing employees to review its separate Insider Trading Policy guidelines.[4] The Code of Conduct states, in relevant part, that:

Every employee is prohibited from using "inside" or material nonpublic information about Zuora, or about companies with which Zuora does business, in connection with buying or selling Zuora's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, Zuora's Insider Trading Policy (the "Insider Trading Policy") and other Zuora policies, to tip or to trade on inside information. Employees

---

[4] These guidelines are not publicly available.

who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Zuora business.

Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Zuora stock or other Zuora securities.
Please review the Insider Trading Policy for additional information.

67.    The Code of Conduct provides that the Company meets its disclosure obligations, and that:

Zuora's disclosure controls and procedures are designed to help ensure that Zuora's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present Zuora's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist Zuora in producing financial disclosures that contain all of the information about Zuora that is required by law and would be important to enable investors to understand Zuora's business and its attendant risks, including, but not limited to:

•    no employee may take or authorize any action that would cause Zuora's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

•    all employees must cooperate fully with Zuora's finance department, as well as Zuora's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that Zuora's books and records, as well as its reports filed with the SEC, are accurate and complete; and

•    no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Zuora's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that Zuora makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

•    act honestly, ethically, and with integrity;

•    comply with this Code;

•    endeavor to ensure complete, fair, accurate, timely and understandable disclosure in Zuora's filings with the SEC;

•    raise questions and concerns regarding Zuora's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
- comply with Zuora's disclosure controls and procedures and internal controls over financial reporting.

68. The Code of Conduct also provides special standards for 'Senior Financial Personnel,' a group that explicitly included Defendants Tzuo and Sloat as Zuora's CEO and CFO:

Zuora's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of Zuora. As such, the Board requires that the Chief Executive Officer and senior personnel in Zuora's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout Zuora as a whole that ensures the accurate and timely reporting of Zuora's financial results and condition. Because of this special role, Zuora requires that the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and any other people performing similar functions ("Senior Financial Employees"):

- Act with honesty and integrity and use due care and diligence in performing his or her responsibilities to Zuora.
- Avoid situations that represent actual or apparent conflicts of interest with his or her responsibilities to Zuora, and disclose promptly to the Committee, any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. Without limiting the foregoing, and for the sake of avoiding an implication of impropriety, Senior Financial Employees will not:
  - o accept any material gift or other gratuitous benefit from a customer, business partner, supplier or vendor of products or services, including professional services, to Zuora (this prohibition is not intended to preclude ordinary course entertainment or similar social events);
  - o except with the approval of the disinterested members of the Board, directly invest in any privately-held company that is a customer, business partner, supplier or vendor of Zuora where the Senior Financial Employee, either directly or through people in his or her chain of command, has responsibility or ability to affect or implement Zuora's relationship with the other company; or
  - o maintain more than a passive investment of greater that 1% of the outstanding shares of a public company that is a customer, business partner, supplier or vendor of Zuora.
- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in Zuora's submissions to governmental agencies or in public statements.
- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.
- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

69.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     Zuora is a technology company based in San Mateo, California that specializes in the research, design, and development of cloud-based subscription software for businesses.

71.     Zuora has two primary products: Zuora Billing, a subscription billing software, and Zuora RevPro, a revenue recognition software. While Billing was a 'home-grown' solution created by Zuora, RevPro was a part of the Company's acquisition of Leeyo in May 2017.

72.     Starting from its Prospectus filed on April 12, 2018, the Company issued multiple statements through SEC filings, press releases, and conferences that led the investing public to believe that: (i) the Company's salesforce was sufficiently trained and staffed; (ii) RevPro was adequately incorporated into Zuora's existing framework; and (iii) the market demand for RevPro would remain relatively strong after the deadline to implement ASU 2014-09 had passed.

73.     ASU 2014-09, also referred to as Topic 606, is a revenue recognition standard that affects businesses engaged in contracting with customers for the transfer of goods or services. It was jointly developed by the Financial Accounting Standard's Board and the International Accounting Standards Board. The guidance was originally issued in 2014 but has since been revised several times. The aim of ASU 2014-09 is to establish international alignment on the method by which businesses recognize revenue. Adherence with ASU 2014-09 is required in the United States by Generally Accepted Accounting Principles ("GAAP") for public entities.

### False and Misleading Statements

#### April 12, 2018 Initial Public Offering Prospectus

74.     On April 12, 2018, Zuora filed the Prospectus with the SEC. Among the items discussed were several paragraphs identifying potential risks to the Company. For example, the Company

provided a general, boilerplate disclaimer about its salesforce, stating the obvious by disclosing that

higher quality, skilled salespeople are more difficult to find and are important to Zuora's business:

> ***Our revenue growth and ability to achieve and sustain profitability will depend, in part on being able to expand our direct sales force and increase the productivity of our sales force.*[5]**
>
> To date, most of our revenue has been attributable to the efforts of our direct sales force. In order to increase our revenue and achieve and sustain profitability, we must increase the size of our direct sales force, both in the United States and internationally, to generate additional revenue from new and existing customers.
>
> We believe that there is significant competition for sales personnel with the skills and technical knowledge that we require. Because our solution is often sold to large enterprises and involves long sales cycle and complex customer requirements, it is more difficult to find sales personnel with the specific skills and technical knowledge needed to sell our solution and, even if we are able to hire qualified personnel, doing so may be expensive. Our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training, and retaining sufficient numbers of direct sales personnel to support our growth. New sales personnel require significant training and can take a number of months to achieve full productivity. Our recent hires and planned hires may not become productive as quickly as we expect and if our new sales employees do not become fully productive on the timelines that we have projected or at all, our revenue will not increase at anticipated levels and our ability to achieve long-term projections may be negatively impacted. We may also be unable to hire or retain sufficient numbers of qualified individuals in the markets where we do business or plan to do business. Furthermore, hiring sales personnel in new countries requires additional set up and upfront costs that we may not recover if the sales personnel fail to achieve full productivity. In addition, as we continue to grow, a larger percentage of our sales force will be new to our company and our solution, which may adversely affect our sales if we cannot train our sales force quickly or effectively. Attrition rates may increase, and we may face integration challenges as we continue to seek to expand our sales force. If we are unable to hire and train sufficient numbers of effective sales personnel, or if the sales personnel are not successful in obtaining new customers or increasing sales to our existing customer base, our business will be adversely affected.

75.     The Prospectus discussed Zuora's recent acquisitions in a similar manner, purporting to

disclose the risks that newly acquired companies and products would not be smoothly incorporated into

Zuora's existing business:

> ***We may be unable to integrate acquired businesses and technologies successfully or to achieve the expected benefits of such acquisitions. We may acquire or invest in additional companies, which may divert our management's attention, result in***

---

[5] Unless otherwise noted, all emphasis is in original.

***additional dilution to our stockholders, and consume resources that are necessary to sustain our business.***

Our business strategy may, from time to time, include acquiring other complementary products, technologies, or businesses. In May 2015, we acquired Frontleaf, Inc., and in May 2017, we acquired Leeyo. We are still in the process of integrating Leeyo's operations into our business. An acquisition, investment, or business relationship may result in unforeseen operating difficulties and expenditures. In particular, we may encounter difficulties assimilating or integrating the businesses, technologies, products, personnel, or operations of the acquired companies, including Leeyo, particularly if the key personnel of the acquired companies choose not to work for us, if an acquired company's software is not easily adapted to work with ours, or if we have difficulty retaining the customers of any acquired business due to changes in management or otherwise. Acquisitions may also disrupt our business, divert our resources, and require significant management attention that would otherwise be available for development of our business. Moreover, the anticipated benefits of any acquisition, investment, or business relationship may not be realized or we may be exposed to unknown liabilities.

76.    On a related note, the Prospectus addressed RevPro, a revenue recognition software that Zuora acquired in conjunction with its purchase of Leeyo in 2017. The Prospectus made explicit the obvious link between the effectiveness and demand of the product and new accounting standards for revenue recognition, most notably ASU 2014-09:

***The market for our revenue recognition automation software product, Zuora RevPro, is rapidly evolving as a result of the effectiveness of ASC 606, which makes it difficult to forecast adoption rates and demand for this product, and could have a material adverse effect on our business and operating results.***

We began selling *Zuora RevPro* following our acquisition of Leeyo in May 2017. We have less experience marketing, determining pricing for, and selling *Zuora RevPro*, and we are still determining how to best market, price, and support adoption of this offering. We have directed, and intend to continue to direct, a significant portion of our financial and operating resources to develop and grow *Zuora RevPro*. The market for *Zuora RevPro* is rapidly evolving as a result of the effectiveness of ASC 606, the revenue recognition accounting standard that will take effect for most public companies in January 2018. While we have seen a significant number of *Zuora RevPro* deployments, particularly in the second half of fiscal 2018, associated with the effectiveness of ASC 606, it is uncertain whether *Zuora RevPro* will achieve and sustain high levels of demand and market acceptance. Accordingly, our future success depends in part upon growth in this market and the ability of our *Zuora RevPro* product to meet the demand for revenue recognition automation solutions. We have limited experience with respect to determining the optimal prices for this solution. Companies may choose to purchase our *Zuora RevPro* product to comply with ASC 606 in the short-term but may develop proprietary solutions in-house or migrate toward other solutions developed by our competitors in the future. Customers may purchase *Zuora RevPro* as a standalone product and not purchase other core Zuora products. The rapidly evolving nature of this market,

as well as other factors that are beyond our control, reduces our ability to accurately evaluate our long-term outlook and forecast annual performance. A reduction or slowdown in demand for revenue recognition automation software, caused by shifts in the marketplace, regulatory requirements, accounting standards, lack of acceptance, technological challenges, and competing solutions, could have a material adverse effect on our business, future growth, operating results, and financial condition.

### *May 31, 2018 Form 8-K and Press Release*

77.    On May 31, 2018, Zuora issued a press release which was also attached to its Form 8-K filed with the SEC the same day, announcing its financial results for its first fiscal quarter ended April 30, 2018. The press release disclosed Zuora's financial results for the quarter, including $51.7 million in revenue and a net loss of $19.4 million.

### *June 13, 2018 Form 10-Q*

78.    On June 13, 2018, the Company filed with the SEC its quarterly report for the period ended April 30, 2018 on a Form 10-Q (the "1Q18"), which was signed by Defendant Sloat.

79.    The 1Q18 confirmed the financial results announced in the May 31, 2018 press release.

80.    Attached to the 1Q18 were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 1Q18.

### *August 30, 2018 Form 8-K, Press Release, and Conference Call*

81.    On August 30, 2018, Zuora issued a press release which was attached to the Company's Form 8-K filed with the SEC the same day, announcing its financial results for its third fiscal quarter ended July 31, 2018. The press release announced the Company's financial results for the quarter, which included $57.8 million in revenue with a net loss of $19.6 million.

82.    Zuora also held a conference call the same day to discuss the Company's second quarter results. During the call, Defendant Sloat assured investors and analysts that Zuora's software would still be in demand after the implementation deadline of ASU 2014-09:

   [John DiFucci, analyst for Jeffries]: Hey, guys. I got a question. I think it's probably best for Tyler. It has to do with RevPro. Listen, we understand the catalyst of ASC 606, but Tyler, you and Tien have both talked about a longer-term opportunity. Can you talk a little bit more about that? Because this is something that comes up a lot in my conversations. And maybe even in the context of that, talk about it in regards to your current traction with RevPro and the pipeline for the future.

[Defendant Sloat]: Yeah, I can definitely take that one, John. I think we're seeing two things. *One, ASC 606 and IFRS 15 was a good driver for customers last year*. We talk about 605 and 606 upgrade. But what we're seeing is that companies had a timeline that they had to get compliant and a lot of them chose to do that through some kind of manual Band-Aid process is what we call it. So, *we're seeing those guys now, they're past their first iteration but they know it's not sustainable and they're going to need a revenue automation solution or 606 going forward. So, those customers are still out there*.

But on top of that, it's all about -- the reason we did the acquisition was not 606. It was about business model complexity that hits both your quote-to-cash solution, as well as your revenue automation. That's really what we're seeing right now, where the Hitachi example that Tien touched on. That's just about just complexity and manual processes. The customer wakes up and they realize they've outsourced all of revenue to some other place and they've got tens and tens of bodies doing this all manually and that's not sustainable. So, that's where *I think the long tailwinds are going to be for RevPro*.

(Emphasis added.)

83.    Several minutes later, during the same exchange, in response to a pointed question as to whether RevPro "has legs beyond just 606 [referring to ASU 2014-09]," Defendant Tzuo responded that "we actually know it has legs."

### September 12, 2018 Form 10-Q

84.    On September 12, 2018, the Company filed with the SEC its quarterly report for the period ended July 31, 2018 on a Form 10-Q (the "2Q18"), which was signed by Defendant Sloat.

85.    The 2Q18 confirmed the financial results discussed in the August 30, 2018 press release.

86.    Attached to the 2Q18 were SOX certifications signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 2Q18.

### November 29, 2018 Form 8-K and Press Release

87.    On November 29, 2018, Zuora issued a press release which was also attached to the Company's Form 8-K filed with the SEC the same day, announcing its financial results for its third quarter ended October 31, 2018. The press release announced Zuora's financial results for the quarter, including $61.6 million in revenue and a net loss of $17.9 million.

### December 13, 2018 Form 10-Q

88.    On December 13, 2018, the Company filed with the SEC its quarterly report for the period ended October 31, 2018 on a Form 10-Q (the "3Q18"), which was signed by Defendant Sloat.

89.     The 3Q18 confirmed the financial results from the November 29, 2018 press release.

90.     Attached to the 3Q18 were SOX certifications signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 3Q18.

### March 21, 2019 Form 8-K and Press Release

91.     On March 21, 2019, Zuora issued a press release which was attached to the Company's Form 8-K filed with the SEC the same day, announcing its financial results for its fourth quarter and full year ended January 31, 2019. The press release announced the Company's financial results for the fiscal year 2019, including revenue of $235.2 million and a net loss of $77.6 million.

92.     The press release also disclosed Zuora's income guidance for the fiscal year that began February 1, 2019 (fiscal 2020), with expected revenue of $289 million to $293.5 million.

### April 18, 2019 10-K

93.     On April 18, 2019, the Company filed the 2019 10-K with the SEC. The 2019 10-K was signed by Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil.

94.     The 2019 10-K, in addition to repeating the 2020 revenue guidance offered in the March 21, 2019 press conference, substantially repeated the boilerplate list of 'potential' risk factors included in the Prospectus:

> **The market for our revenue recognition automation software product, Zuora RevPro, is rapidly evolving as a result of the effectiveness of ASC 606, which makes it difficult to forecast adoption rates and demand for this product, and could have a material adverse effect on our business and operating results.**
>
> We began selling *Zuora RevPro* following our acquisition of Leeyo Software, Inc. in May 2017. We have less experience marketing, determining pricing for, and selling *Zuora RevPro*, and we are still determining how to best market, price, and support adoption of this offering. We have directed, and intend to continue to direct, a significant portion of our financial and operating resources to develop and grow *Zuora RevPro*. The market for *Zuora RevPro* is rapidly evolving as a result of the effectiveness of ASC 606, the revenue recognition accounting standard that took effect for most public companies in January 2018. While we have seen a significant number of *Zuora RevPro* deployments associated with the effectiveness of ASC 606, it is uncertain whether *Zuora RevPro* will achieve and sustain high levels of demand and market acceptance. Accordingly, our future success depends in part upon growth in this market and the ability of our *Zuora RevPro* product to meet the demand for revenue recognition automation solutions. We have limited experience with respect to determining the optimal prices for this solution. Companies may choose to purchase our *Zuora RevPro* product to comply with ASC 606

in the short-term but may develop proprietary solutions in-house or migrate toward other solutions developed by our competitors in the future. Customers may purchase *Zuora RevPro* as a standalone product and not purchase other core Zuora products. The rapidly evolving nature of this market, as well as other factors that are beyond our control, reduces our ability to accurately evaluate our long-term outlook and forecast annual performance. A reduction or slowdown in demand for revenue recognition automation software, caused by shifts in the marketplace, regulatory requirements, accounting standards, lack of acceptance, technological challenges, and competing solutions, could have a material adverse effect on our business, future growth, operating results, and financial condition.

***Our revenue growth and ability to achieve and sustain profitability will depend, in part on being able to expand our direct sales force and increase the productivity of our sales force.***

To date, most of our revenue has been attributable to the efforts of our direct sales force. In order to increase our revenue and achieve and sustain profitability, we must increase the size of our direct sales force, both in the United States and internationally, to generate additional revenue from new and existing customers.

We believe that there is significant competition for sales personnel with the skills and technical knowledge that we require. Because our solution is often sold to large enterprises and involves long sales cycle and complex customer requirements, it is more difficult to find sales personnel with the specific skills and technical knowledge needed to sell our solution and, even if we are able to hire qualified personnel, doing so may be expensive. Our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training, and retaining sufficient numbers of direct sales personnel to support our growth. New sales personnel require significant training and can take a number of months to achieve full productivity. Our recent hires and planned hires may not become productive as quickly as we expect and if our new sales employees do not become fully productive on the timelines that we have projected or at all, our revenue will not increase at anticipated levels and our ability to achieve long-term projections may be negatively impacted. We may also be unable to hire or retain sufficient numbers of qualified individuals in the markets where we do business or plan to do business. Furthermore, hiring sales personnel in new countries requires additional set up and upfront costs that we may not recover if the sales personnel fail to achieve full productivity. In addition, as we continue to grow, a larger percentage of our sales force will be new to our company and our solution, which may adversely affect our sales if we cannot train our sales force quickly or effectively. Attrition rates may increase, and we may face integration challenges as we continue to seek to expand our sales force. If we are unable to hire and train sufficient numbers of effective sales personnel, or if the sales personnel are not successful in obtaining new customers or increasing sales to our existing customer base, our business will be adversely affected.

\* \* \*

***If we fail to integrate our solution with a variety of operating systems, software applications, and hardware platforms that are developed by others, our solution may***

*become less marketable, less competitive, or obsolete, and our operating results may be adversely affected.*

Our solution must integrate with a variety of network, hardware, and software platforms, and we need to continuously modify and enhance our solution to adapt to changes in cloud-enabled hardware, software, networking, browser, and database technologies. We have developed our solution to be able to integrate with third-party software-as-a-service (SaaS) applications, including the applications of software providers that compete with us, through the use of APIs. For example, *Zuora CPQ* integrates with certain capabilities of Salesforce using publicly available APIs. In general, we rely on the fact that the providers of such software systems, including Salesforce, continue to allow us access to their APIs to enable these integrations. To date, we have not relied on a long-term written contract to govern our integration relationship with Salesforce. Instead, we are subject to the standard terms and conditions for application developers of Salesforce, which govern the distribution, operation, and fees of applications on the Salesforce platform, and which are subject to change by Salesforce from time to time. We also integrate certain aspects of our solution with other platform providers. Any deterioration in our relationship with any platform provider may adversely impact our business and operating results.

95.     Attached to the 2019 10-K were SOX certifications signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 2019 10-K.

**May 8, 2019 Proxy Statement**

96.     The Company filed its 2019 Proxy Statement with the SEC on May 8, 2019. Defendants Fenton, Goldman, Haley, Pressman, Tzuo, Volpi, and Yesil solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

97.     The 2019 Proxy Statement stated, regarding the Company's Code of Conduct, that:

We are committed to ethical business practices and, accordingly, we have adopted a Global Code of Business Conduct and Ethics (Code of Conduct) that applies to all the members of our Board of Directors, officers and employees. Our Code of Conduct is available on our website at *https://investor.zuora.com/governance/governance-documents.* We intend to disclose future amendments to certain portions of the Code of Conduct or waivers of such provisions granted to executive officers and directors on our website, as permitted under applicable New York Stock Exchange and SEC rules.

98.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

statements alleged herein, the insider trading engaged in by four of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

99.     The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to incentivize "growth of sustainable long-term value for our stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

100.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (2) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (3) this deferral of RevPro's integration would significantly and adversely affect the Company; (4) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (5) consequently, demand for RevPro's software would foreseeably diminish  after the implementation deadline for ASU 2014-09; and (6) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

101.    The statements in ¶¶ 74-95 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (2) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (3) this deferral of RevPro's integration would significantly and adversely affect the Company; (4) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (5) consequently, demand for RevPro's software would foreseeably diminish  after the implementation deadline for ASU 2014-09; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

102.     On May 30, 2019, Zuora filed a current report on Form 8-K with the SEC lowering its revenue guidance for fiscal year 2020 to $268 million to $278 million, from its prior estimate of $289 million to $293.5 million.

103.     Indeed, the same day, the Company held a conference call with analysts and investors. In his opening remarks, Defendant Tzuo admitted that issues of "sales execution" and "product integration" were to blame for the guidance adjustment.

104.     In elaboration, Defendant Tzuo described how Zuora's recently expanded salesforce had suffered from inefficiency among its undertrained and under supervised new members:

> First, based on what I saw in Q1, we need to improve our sales execution. As you know from our recent calls, Global 2000 companies have been an important source of our recent growth companies like Caterpillar, Ford and Schneider Electric. And so we've been expanding our strategic sales teams and have hired a number of talented salespeople over the past year. What we're seeing in Q1 is that *the newer reps were less than half as productive than our more experienced reps*. We're finding that we need to improve the support of our new reps with training, and experienced oversight to help them ramp and close new businesses.

105.     The underlying reason for the product integration problems was less clear, until Defendant Tzuo, during an exchange with John DiFucci of Jeffries, revealed that the Company had essentially focused so much on the ASU 2014-09 deadline that it had ignored the need to integrate RevPro, its acquired flagship product, with its other 'home-grown' products, like Zuora Billing:

> [John DiFucci, Jeffries]: …So, Tien I sort of get the integration of Billings and RevPro and how that could sort of slow some things down, but… *I mean you bought Leeyo two years ago. So I'd just like, it's hard, like how could it not be integrated?* How could that be slowing things down right now? And then kind of related to that, like you're talking about cross sell, what about the other products? Like what about CPQ and Connect and Analytics? Are you seeing any traction there? Or is that something else that also needs to be integrated better?
>
> [Defendant Tzuo]: No, no. I'll give you some color there. We did acquire Leeyo a little less than two years ago, but I guess where you all coming on two years. *The first year was really focused on ASC 606, all right and there was such a tight deadline to get the core set up*, dozens close to 100 customers live on ASC 606. And so, John, that was, that took us all the way through -- when these adoption standards were right, so I'll call it Q1, Q2 of last year.
>
> So honestly, *we didn't really have time and the resources to focus on the integration between the two, until after the 606 waive was complete. So we didn't really start heavy*

***work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end a false direction.*** We course corrected…

(Emphasis added).

106.    As analysts and investors absorbed the disclosures, Zuora's share price declined by $5.91 (almost 30%) on a trading volume of nearly 19 million, from a close of $19.90 on May 30, 2019 to close at $13.99 on May 31, 2019. The next trading day, Zuora's stock fell another $0.63 to close at $13.26 on June 3, 2019.

## DAMAGES TO ZUORA

107.    As a direct and proximate result of the Individual Defendants' conduct, Zuora has lost and expended, and will lose and expend, many millions of dollars.

108.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its President and CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

109.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

110.    As a direct and proximate result of the Individual Defendants' conduct, Zuora has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

111.    Plaintiff brings this action derivatively and for the benefit of Zuora to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zuora, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

112.    Zuora is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Zuora. Plaintiff will adequately and fairly represent the interests of Zuora in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

115.    A pre-suit demand on the Board of Zuora is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants Tzuo, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

116.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $21.8 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

117.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

118.     Additional reasons that demand on Defendant Tzuo is futile follow. Defendant Tzuo is the co-founder of the Company and has served as the Company's Chairman and CEO since its inception. He also serves as a member of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Tzuo with his principal occupation, and he receives handsome compensation, including $1,996,581 during the fiscal year ended January 31, 2019. Defendant Tzuo was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, most of which he personally made statements in, and the 2019 10-K and 1Q18, 2Q18, and 3Q18 which he signed and/or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In violation of the Code of Conduct, he failed to uphold his duties as a Senior Financial Officer to ensure that the Company remained in compliance with relevant laws and regulations surrounding Zuora's public statements. Moreover, Defendant Tzuo is a defendant in the Securities Class Action. For these reasons, too, Defendant Tzuo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.     Additional reasons that demand on Defendant Fenton is futile follow. Defendant Fenton has served as a Company director since December 2007 and serves as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fenton signed, and thus personally made the false and misleading statements in, the 2019 10-K. For these reasons, too, Defendant Fenton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.     Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman has served as a Company director since February 2016 and serves as Chair of the Audit Committee.  Defendant Goldman receives handsome compensation, including $187,483 during the fiscal year ended January 31, 2019. As Chair of the Audit Committee and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Goldman signed, and thus personally made the false and misleading statements in, the 2019 10-K. His insider sale before the fraud was exposed, which yielded $697,200 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.     Additional reasons that demand on Defendant Haley is futile follow. Defendant Haley has served as a Company director since October 2010 and serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Haley signed, and thus personally made the false and misleading statements, in the 2019 10-K. For these reasons, too, Defendant Haley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.     Additional reasons that demand on Defendant Pressman is futile follow. Defendant Pressman has served as a Company director since November 2008 and serves on the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his

duties to protect corporate assets. Furthermore, Defendant Pressman signed, and thus personally made the false and misleading statements, in the 2019 10-K. His insider sales before the fraud was exposed, which yielded $39,314 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Pressman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Volpi is futile follow. Defendant Volpi has served as a Company director since November 2011 and serves as a member of the Audit Committee. As an Audit Committee member and trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Volpi signed, and thus personally made the false and misleading statements, in the 2019 10-K. His insider sales before the fraud was exposed, which yielded at least $21 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Volpi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Yesil is futile follow. Defendant Yesil has served as a Company director since May 2017. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Yesil receives handsome compensation, including $189,358 during the fiscal year ended January 31, 2019. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Yesil signed, and thus personally made the false and misleading statements in, the 2019 10-K. For these reasons, too, Defendant Yesil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

125.    Additional reasons that demand on the Board is futile follow.

126.    As described above, three of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Goldman, Pressman, and Volpi collectively received proceeds of over $21.8 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

127.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Tzuo and Yesil worked closely together at SalesForce as core members of the newly founded Company from 1999 to 2005. Defendants Fenton and Volpi also have multiple business relationships, having both served on the Board of Directors of Hortonworks, Inc. from 2011 to January 2019 and both currently serve on the board of Elastic N.V. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

128.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

129.    Zuora has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zuora any part of the

damages Zuora suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

130.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

131.    The acts complained of herein constitute violations of fiduciary duties owed by Zuora officers and directors, and these acts are incapable of ratification.

132.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zuora. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zuora, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

133.    If there is no directors' and officers' liability insurance, then the Directors will not cause Zuora to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

134.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of

### Section 14(a) of the Exchange Act

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

137.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

138.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

139.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company had focused on RevPro's new customer support, to the

detriment of the product's overall integration into Zuora's own operations; (2) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (3) this deferral of RevPro's integration would significantly and adversely affect the Company; (4) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (5) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (6) the Company failed to maintain internal controls.

140.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to incentivize "the growth of sustainable long-term value for [Zuora's] stockholders," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

141.    The 2019 Proxy Statement also made references to the Code of Conduct, which required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2019 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

142.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors and ratification of an independent auditor.

143.    The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Haley and Yesil, which allowed them to continue breaching their fiduciary duties to Zuora.

144.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

145.    Plaintiff on behalf of Zuora has no adequate remedy at law.

### SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zuora's business and affairs.

148.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zuora.

150.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls. In further breach of their fiduciary duties owed to Zuora, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (2) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (3) this deferral of RevPro's integration would significantly and adversely affect the Company; (4) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (5) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

151.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

152.    In breach of their fiduciary duties, ten of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

153.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

154.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

155.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

156.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zuora has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

157.    Plaintiff on behalf of Zuora has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zuora.

160.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Zuora that was tied to the performance or artificially inflated valuation of Zuora, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

161.    Plaintiff, as a shareholder and a representative of Zuora, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

162.    Plaintiff on behalf of Zuora has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

165.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

166.    Plaintiff on behalf of Zuora has no adequate remedy at law.

## PRAYER FOR RELIEF

167.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Zuora, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zuora;

(c)     Determining and awarding to Zuora the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Zuora and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zuora and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zuora to nominate at least four

candidates for election to the Board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)      Awarding Zuora restitution from the Individual Defendants, and each of them;

      (f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2019                Respectfully submitted,

                                    **THE ROSEN LAW FIRM, P.A.**

                                    /s/Laurence M. Rosen
                                    Laurence M. Rosen (SBN 219683)
                                    355 S. Grand Avenue, Suite 2450
                                    Los Angeles, CA 90071
                                    Telephone: (213) 785-2610
                                    Facsimile: (213) 226-4684
                                    Email: lrosen@rosenlegal.com

                                    *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Andrew Lichter  am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2019.

9/8/2019

DocuSigned by:

Andrew Lichter

9857D9AD8D9D4B4...

Andrew Lichter