Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ZUORA, INC. DERIVATIVE LITIGATION | Lead Case No. 3:19-cv-05701-SI (Consolidated with Case No. 3:19-cv-05702-SI) |
| This Document Relates to:<br><br>ALL ACTIONS | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

Plaintiffs Andrew Lichter and Keith Beaven ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Zuora, Inc. ("Zuora" or the "Company"), file this Verified Consolidated Shareholder Derivative Complaint against Individual Defendants Tien Tzuo, Tyler Sloat, Marc Diouane, Peter Fenton, Kenneth A. Goldman, Timothy Haley, Jason Pressman, Michelangelo Volpi, and Magdalena Yesil (collectively, the "Individual Defendants," and together with Zuora, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zuora, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 21D of the Exchange Act. As for their complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of internal Company documents produced to Plaintiffs' counsel by Defendants, Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zuora, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zuora's directors and officers from April 12, 2018 through May 30, 2019 (the "Relevant Period").

2.      Zuora is a technology company specializing in cloud-based software that assists businesses offering subscription services. Zuora's business model is itself a subscription service, wherein subscribers receive ongoing access to services rather than a discrete unit of products or services.

3.      Two of Zuora's flagship products are Zuora Billing ("Billing"), a billing software to assist companies with billing its subscribers, and Zuora RevPro ("RevPro"), a software tool intended to assist companies with recognizing revenue. Approximately 90% of the Company's customers use Billing. While Billing was created by Zuora, RevPro was a part of the Company's acquisition of Leeyo Software, Inc. ("Leeyo") in May 2017. The Company's subscription-based products account for a significant portion (more than 70%) of Zuora's annual revenue.

4.      Zuora was incorporated in Delaware as a private company in 2006, beginning operations at its San Mateo headquarters in 2007. On April 12, 2018, Zuora filed its initial public offering ("IPO") prospectus with the SEC on Form 424B4 (the "Prospectus"), confirming its plans to become a public company. The Prospectus was incorporated into and formed a part of the Company's registration statement (the "Registration Statement"), which had been declared effective the prior day, April 11, 2018. The Prospectus represented, among other things, that Zuora offered "an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition," that "engineering and IT departments [would] no longer need to build in-house custom systems or customizations" for their enterprise management software, and that Billing and RevPro customers could be upsold to utilize the other software.

5.      In fact, these representations were untrue. RevPro and Billing were not integrated and thus did provide an orchestrated and automated order-to-cash process free of the need to create in-house workarounds. On the contrary, transferring data from Billing into RevPro required a customer to do so manually or to create their own software solution at significant cost. This hampered Zuora's ability to sell users of one software product on the other. In fact, customers using both software offerings complained to the Company that they did not work as expected due to the lack of integration. Thus, the Individual Defendants remained fully aware of the lack of integration between Billing and RevPro during the Relevant Period.

6.      As evidence, there were at least three in-house projects with the goal of integrating Billing and RevPro: the Zuora-on-Zuora ("ZoZ") project, the Keystone project, and the K-2 project. The highest levels of management personally oversaw and received updates on these projects. Moreover, the

Board of Directors (the "Board") regularly received updates on these projects and the integration status of Billing and RevPro.

7.      Notwithstanding their knowledge, throughout the Relevant Period, the Individual Defendants made and caused the Company to make false and misleading statements which failed to disclose that RevPro and Billing were not integrated and that the Company was overstating its financial results by not disclosing the adverse effects of the lack of integration as well as other problems.

8.      On May 30, 2019, in a press release and on an earnings conference call, Zuora reported poorer financial results than expected, lowered its revenue guidance by $15.5-$21 million from its previous range to $268-278 million for the fiscal year ended January 31, 2020, and announced that Defendant Marc Diouane ("Diouane") was stepping down as President.

9.      On this news, the price per share of Zuora stock dropped almost 30% ($5.91) from its closing price of $19.90 on May 30, 2019, to close at $13.99 the next trading day, on May 31, 2019. The price of the Company's shares continued to drop over the next trading session, decreasing by an additional $0.63 to close at $13.26 on June 3, 2019.

10.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. Meanwhile, five of the Individual Defendants were engaged in insider sales, netting proceeds of nearly $50 million.

12.     In light of the Individual Defendants' misconduct—which has subjected Zuora, its Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO"), to being named as defendants in a consolidated securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Federal Securities Class Action"), further subjected the Company, its CEO, its former CFO, and six current and former directors to a consolidated securities class action pending in the Superior Court of California, County of San Mateo (the "State Securities Class Action" and with the Federal Securities Class Action, the "Securities Class Actions"), and further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Zuora's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9; Section 11(f) of the Securities Act, 15 U.S.C.

§ 77k(f)(1); Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b); and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f)..

15.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act or the Securities Act.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.     Venue is proper in this District because Zuora and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

21.     Plaintiff Andrew Lichter is a current shareholder of Zuora common stock. Plaintiff Andrew Lichter has continuously held Zuora common stock at all relevant times.

22.     Plaintiff Keith Beaven is a current shareholder of Zuora common stock. Plaintiff Keith Beaven  has continuously held Zuora common stock at all relevant times.

### Nominal Defendant Zuora

23.     Zuora is a Delaware corporation with its principal executive offices at 101 Redwood Shores Parkway, Redwood City, California 94065. Zuora's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ZUO."

24. The Company has two classes of common stock, which have different voting power. Class A common stock, which were issued for the Company's first round of funding, are worth one vote and trade on the NYSE. Class B common stock are worth ten votes and do not trade on any market in this form, but these stocks convert to Class A common stock when they are traded.

**Defendant Tzuo**

25. Defendant Tzuo cofounded Zuora in 2007 and has served as the Company's CEO and as a director since its inception. According to the Company's Schedule 14A filed with the SEC on May 8, 2019 (the "2019 Proxy Statement"), as of March 31, 2019, Defendant Tzuo beneficially owned 21,401,650 shares[1] of the Company's common stock, which represented 25.6% of the Company's voting power on that date. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019[2] was $20.03 per share, Tzuo owned approximately $200.6 million worth of Zuora stock.

26. For the fiscal year ended January 31, 2020, Defendant Tzuo received $3,435,030 in compensation from the Company. This included $365,000 in salary, $2,989,000 in option awards, and $81,030 in non-equity incentive plan compensation. For the fiscal year ended January 31, 2019, Defendant Tzuo received $2,996,581 in compensation from the Company. This included $350,000 in salary, $2,453,636 in option awards, $178,720 in non-equity incentive plan compensation, and $14,225 in other compensation.

27. The Company's 2019 Proxy Statement stated the following about Defendant Tzuo:
*Tien Tzuo* has served on our Board of Directors and as our Chief Executive Officer since November 2007 and as the Chairman of our Board of Directors since December 2017. Prior to joining us, Mr. Tzuo served as Chief Strategy Officer at salesforce.com, inc., a provider of customer relationship management software, from 2005 to 2008, and as Chief Marketing Officer from 2003 to 2005. Mr. Tzuo holds a B.S. in electrical engineering from Cornell University and an M.B.A. from Stanford University. We believe that Mr. Tzuo is qualified to serve on our Board of Directors because of the industry perspective and experience that he brings as our founder, Chairman of our Board of Directors, and Chief Executive Officer.

---

[1] For each Individual Defendant, beneficial stock ownership represents the value of the total number of shares held, including Class A and Class B common stock. Though Class B common stock may not be traded, Class B common stock may be converted to Class A stock (and thereby be traded) at any time.
[2] This date represents the closing price of the Company's stock on the last day of trading prior to March 31, 2019.

**Defendant Sloat**

28. Defendant Tyler Sloat ("Sloat") served as Zuora's CFO from 2010 until April 2020.

29. For the fiscal year ended January 31, 2020, Defendant Sloat received $2,176,863 in compensation from the Company. This included $365,000 in salary, $39,420 in bonus, $940,720 in stock awards, $750,693 in option awards, and $81,030 in non-equity incentive plan compensation.

30. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sloat made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| September 5, 2018 | 344,009 | $26.10 | $8,978,635 |
| March 26, 2019 | 364,528 | $20.04 | $7,305,141 |
| March 28, 2019 | 35,472 | $20.00 | $709,440 |

Thus, in total, before the fraud was exposed, he sold 744,009 Company shares on inside information, for which he received approximately $17 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

31. The annual report filed by the Company with the SEC on Form 10-K on April 18, 2019 ("2019 10-K") stated the following about Defendant Sloat:

> *Tyler R. Sloat* joined Zuora's executive management team as CFO in 2010 with more than fifteen years of experience in executive finance roles for payment, software and hardware technology companies varying in size from start-up to Fortune 500. Prior to Zuora, Mr. Sloat was the Chief Financial Officer for Obopay, where he was responsible for all finance, accounting, treasury operations and business intelligence functions. Before Obopay, Mr. Sloat was the Controller of the Emerging Products Group at Network Appliance, Inc. Mr. Sloat is a registered C.P.A. (inactive) in the State of California, has an M.B.A. from the Stanford Graduate School of Business and has a B.A. from Boston College.

**Defendant Diouane**

32. Defendant Diouane served as the Company's President from February 2015 until May 2019 when he transitioned to an advisory position prior to leaving the Company in June 2019.

According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Diouane beneficially owned 1,409,982 shares of the Company's common stock, which represented 3.7% of the Company's voting power on that date. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Defendant Diouane owned approximately $28.2 million worth of Zuora stock.

33.     For the fiscal year ended January 31, 2020, Defendant Diouane received $1,607,610 in compensation from the Company. This included $350,000 in salary, $821,192 in option awards, and $285,950 in non-equity incentive plan compensation. For the fiscal year ended January 31, 2019, Defendant Diouane received $1,457,142 in compensation from the Company. This included $350,000 in salary, $821,192 in option awards, and $285,950 in non-equity incentive plan compensation.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Diouane made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 5, 2018 | 34,200 | $26.23 | $897,066 |
| December 6, 2018 | 130,500 | $18.03 | $2,352,393 |
| March 26, 2019 | 130,000 | $19.99 | $2,598,180 |
| April 29, 2019 | 240,000 | $22.20 | $5,326,800 |

Thus, in total, before the fraud was exposed, he sold 534,700 Company shares on inside information, for which he received approximately $11.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35.     The 2019 10-K stated the following about Defendant Diouane:

*Marc Diouane* has served as our President since February 2015. Prior to this, Mr. Diouane served as our Executive Vice President, Field Operations from March 2014 to February 2015. Prior to joining us, Mr. Diouane served as Executive Vice President, Global Services & Partners at PTC Inc., a product development software company, from October 2010 to March 2014, and as Senior Divisional Vice President—Europe, Middle East, Africa and Asia, from 2005 to 2010. Mr. Diouane holds a Masters from Bordeaux Business School, or ESICI.

**Defendant Fenton**

36.     Defendant Peter Fenton ("Fenton") served as a Company director from December 2007 until June 2021. He also served as a member of the Audit Committee during the Relevant Period. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Fenton beneficially owned 7,791,086 shares of the Company's common stock, which represented 20.9% of the Company's voting power on that date. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Fenton owned approximately $156 million worth of Zuora stock.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Fenton:

*Peter Fenton* has served as a member of our Board of Directors since December 2007. Since 2006, Mr. Fenton has served as a General Partner of Benchmark Capital Partners, a venture capital firm. From 1999 to 2006, Mr. Fenton served as a Managing Partner at Accel Partners, a venture capital firm. Mr. Fenton currently serves on the board of directors of Cloudera, Inc., Elastic N.V., New Relic, Inc., and several private companies. Mr. Fenton also served on the Boards of Directors of Twitter, Inc. from February 2009 to May 2017, Zendesk, Inc. from March 2015 to November 2017, Hortonworks, Inc. from July 2011 to January 2019, and Yelp, Inc. from September 2006 to March 2019. Mr. Fenton holds a B.A. in philosophy and an M.B.A. from Stanford University. We believe Mr. Fenton is qualified to serve as a member of our Board of Directors because of his extensive experience in the venture capital industry, his knowledge of technology companies, and his service on the boards of directors of various public and private companies.

**Defendant Goldman**

38.     Defendant Kenneth A. Goldman ("Goldman") has served as a Company director since February 2016. He also serves as Chair of the Audit Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Goldman beneficially owned 231,058 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Goldman owned approximately $4.6 million worth of Zuora stock.

39.     For the fiscal year ended January 31, 2020, Defendant Goldman received $199,991 in compensation from the Company. This included $50,000 in fees earned or cash paid and $149,991 in stock awards. For the fiscal year ended January 31, 2019, Defendant Goldman received $187,483 in

compensation from the Company. This included $37,500 in fees earned or cash paid, and $149,983 in stock awards.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Goldman made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| March 26, 2019 | 35,000 | $19.92 | $697,200 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

41.     The Company's 2019 Proxy Statement stated the following about Defendant Goldman: *Kenneth A. Goldman* has served as a member of our Board of Directors since February 2016. Mr. Goldman has served as the President of Hillspire LLC, a wealth management service provider, since September 2017. From October 2012 to June 2017, Mr. Goldman served as the Chief Financial Officer of Yahoo! Inc. Prior to this, Mr. Goldman was the Senior Vice President and Chief Financial Officer of Fortinet Inc., a provider of threat management technologies, from 2007 to 2012. From 2006 to 2007, Mr. Goldman served as Executive Vice President and Chief Financial Officer of Dexterra, Inc., a mobile enterprise software company. From 2000 until 2006, Mr. Goldman served as Senior Vice President of Finance and Administration and Chief Financial Officer of Siebel Systems, Inc. From January 2015 to December 2017, Mr. Goldman served as a member of the PCAOB, Standing Advisory Group. Mr. Goldman currently serves on the board of directors of GoPro, Inc., NXP Semiconductor N.V., TriNet Group, Inc., RingCentral, Inc. and several private companies. Mr. Goldman is also on the board of directors of the SASB (Sustainability Accounting Standard Board) Foundation, which is responsible for the financing, oversight, administration and appointment of the SASB Standard Board. In addition, he is a Trustee Emeritus on the board of trustees of Cornell University. Mr. Goldman holds a B.S. in electrical engineering from Cornell University and an M.B.A. from Harvard Business School. We believe Mr. Goldman is qualified to serve as a member of our Board of Directors based on his experience serving on the boards of directors of numerous companies, his extensive executive experience, and his prior experience as a member of the Financial Accounting Standards Advisory Council and the PCAOB's Standing Advisory Group.

**Defendant Haley**

42.     Defendant Timothy Haley ("Haley") has served as a Company director since October 2010. He also serves as Chair of the Compensation Committee and as a member of the Nominating and

Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Haley beneficially owned 3,109,032 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Haley owned approximately $62.27 million worth of Zuora stock.

43.    The Company's 2019 Proxy Statement stated the following about Defendant Haley:

*Timothy Haley* has served as a member of our Board of Directors since October 2010. Mr. Haley is a Managing Director at Redpoint Ventures, a venture capital firm, which he co-founded in 1999. Prior to co-founding Redpoint Ventures, Mr. Haley was a Managing Director of Institutional Venture Partners, a venture capital firm. From 1986 to 1998, Mr. Haley was the President of Haley Associates, an executive recruiting firm in the high technology industry. Mr. Haley currently serves on the board of directors of Netflix, Inc., 2U, Inc., and several private companies. Mr. Haley is also on the Board of Trustees of Santa Clara University. Mr. Haley holds a B.A. in philosophy from Santa Clara University. We believe that Mr. Haley brings strategic and financial experience to the Board of Directors. He has evaluated, invested in, and served as a board member on numerous companies. His executive recruiting background also provides the Board of Directors with insight into talent selection and management.

**Defendant Pressman**

44.    Defendant James C. Pressman ("Pressman") has served as a Company director since November 2008. He also serves as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Pressman beneficially owned 2,805,074 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Pressman owned approximately $56 million worth of Zuora stock.

45.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Pressman made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 17, 2018 | 1,050 | $17.87 | $18,764 |
| March 26, 2019 | 1,040 | $19.76 | $20,550 |

Thus, in total, before the fraud was exposed, he sold 2,090 Company shares on inside information, for which he received approximately $39,314. His insider sales made with knowledge of material non-

public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

46.     The Company's 2019 Proxy Statement stated the following about Defendant Pressman:

*Jason Pressman* has served as a member of our Board of Directors since September 2008. Mr. Pressman is a Managing Director at Shasta Ventures, a venture capital firm, where he has worked since 2005. Prior to Shasta Ventures, Mr. Pressman served as a Vice President of Strategy and Operations at Walmart.com, a subsidiary of Wal-Mart Stores, Inc., a worldwide retailer, from 2000 to 2004. Mr. Pressman is currently a member of the board of directors of several private companies. Mr. Pressman holds a B.S. in finance from the University of Maryland, College Park and an M.B.A. from Stanford University. We believe that Mr. Pressman is qualified to serve on our Board of Directors because of his operations and strategy experience gained from the retail industry and for his corporate finance expertise gained in the venture capital industry serving on boards of directors of various technology companies.

**Defendant Volpi**

47.     Defendant Michelangelo Volpi ("Volpi") served as a Company director from November 2011 until June 2020. He also served as a member of the Audit Committee during the Relevant Period. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Volpi beneficially owned 1,428,157 shares of the Company's common stock, which represented 3.9% of the voting power for the Company. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Volpi owned approximately $28.6 million worth of Zuora stock.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Volpi made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 5, 2018 | 28,780 | $ 26.52 | $ 763,246 |
| December 11, 2018 | 137,629 | $ 18.66 | $ 2,568,157 |
| December 12, 2018 | 563,941 | $ 18.77 | $ 10,585,173 |
| December 13, 2018 | 44,800 | $ 18.44 | $ 826,112 |
| December 14, 2018 | 23,471 | $ 18.32 | $ 521,589 |
| December 19, 2018 | 95,398 | $ 18.22 | $ 1,738,152 |

| December 20, 2018 | 39,762 | $ 18.26 | $ 726,054 |
| January 4, 2019 | 161,116 | $ 18.43 | $ 2,969,368 |
| March 26, 2019 | 19,187 | $ 19.48 | $373,763 |

Thus, in total, before the fraud was exposed, he sold 1,119,084 Company shares on inside information, for which he received approximately $21.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2019 Proxy Statement stated the following about Defendant Volpi:

*Michelangelo Volpi* has served as a member of our Board of Directors since November 2011. Mr. Volpi is a Partner at Index Ventures, a venture capital firm, where he has worked since 2009. From 2007 to 2009, Mr. Volpi served as Chief Executive Officer of Joost N.V., an internet video services company. From 1994 to 2007, Mr. Volpi served in various executive roles at Cisco Systems, Inc., a technology company, including as Senior Vice President and General Manager, Routing and Service Provider Group and as Chief Strategy Officer. Mr. Volpi currently serves on the board of directors of Elastic N.V., Fiat Chrysler Automobiles N.V., Sonos, Inc., and several private companies. Mr. Volpi also served on the Boards of Directors of Hortonworks, Inc. from October 2011 to January 2019, and Pure Storage, Inc. from April 2014 to October 2018. Mr. Volpi earned a B.S. in mechanical engineering, an M.S. in manufacturing systems engineering, and an M.B.A. from Stanford University. Mr. Volpi's qualifications for board service include his leadership experience, expertise as a venture capital investor, knowledge regarding the enterprise technology industry, and his service on the boards of directors of numerous public and private companies.

**Defendant Yesil**

50.     Defendant Magdalena Yesil ("Yesil") has served as a Company director since May 2017. She also serves as Chair of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Yesil beneficially owned 157,204 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $20.03 per share, Yesil owned approximately $3.15 million worth of Zuora stock.

51.     For the fiscal year ended January 31, 2020, Defendant Yesil received $202,491 in compensation from the Company. This included $52,500 in fees earned or cash paid, and $149,991 in

stock awards. For the fiscal year ended January 31, 2019, Defendant Yesil received $189,358 in compensation from the Company. This included $37,500 in fees earned or cash paid, and $149,983 in stock awards.

52.     The Company's 2019 Proxy Statement stated the following about Defendant Yesil:

*Magdalena Yesil* has served as a member of our Board of Directors since May 2017. She is the Executive Chair of Informed, Inc., d/b/a DriveInformed, a software company serving the auto lending industry, since April 2016. In 2010, Ms. Yesil co-founded Broadway Angels, an angel investment group. Ms. Yesil was also an early investor in salesforce.com, inc. and served on that company's board of directors for more than five years. She was a General Partner at U.S. Venture Partners, a venture capital firm, from 1998 to 2006. Ms. Yesil founded MarketPay Associates, L.L.C., a software company, and served as its Chief Executive Officer and President from 1996 to 1997. Ms. Yesil co-founded and served as Vice President of Marketing and Technology of CYCH, Inc. (f/k/a CyberCash, Inc.), a secure electronic payment company. Ms. Yesil currently serves on the board of directors of Smartsheet Inc. and several private companies. Ms. Yesil also served on the Board of Directors of RPX Corporation from March 2017 to June 2018. Ms. Yesil received a B.S. in industrial engineering and management science and an M.S. in electrical engineering from Stanford University. We believe Ms. Yesil is qualified to serve as a member on our Board of Directors based on her extensive experience as an investor in the technology industry, as a founder of multiple technology companies, as well as her public and private company board experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

53.     By reason of their positions as officers, directors, and/or fiduciaries of Zuora and because of their ability to control the business and corporate affairs of Zuora, the Individual Defendants owed Zuora and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zuora in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zuora and its shareholders so as to benefit all shareholders equally.

54.     Each director and officer of the Company owes to Zuora and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zuora, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.     To discharge their duties, the officers and directors of Zuora were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zuora, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zuora's Board at all relevant times.

58.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

59.     To discharge their duties, the officers and directors of Zuora were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zuora were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner

in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zuora's own Global Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zuora conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zuora and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zuora's operations would comply with all applicable laws and Zuora's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60.     Each of the Individual Defendants further owed to Zuora and the shareholders the duty of loyalty requiring that each favor Zuora's interest and that of its shareholders over their own while

conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Zuora and were at all times acting within the course and scope of such agency.

62.     Because of their advisory, executive, managerial, and directorial positions with Zuora, each of the Individual Defendants had access to adverse, non-public information about the Company.

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zuora.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act and Securities Act.

66.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Zuora, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zuora and was at all times acting within the course and scope of such agency.

## ZUORA'S CODE OF CONDUCT

69.     The Company's Code of Conduct, states that it "applies to every member… of the Board of Directors (the 'Board'), officer, employee, independent contractor and consultant of Zuora…"

70.     The Code of Conduct provides, under the section titled, "Responsibility," that the Company strives for high ethical standards, especially of honesty and integrity, stating that:

> This Code cannot address every ethical issue or circumstance that may arise, so, in complying with the letter and spirit of this Code, employees must apply common sense, together with high personal standards of ethics, honesty and accountability, in making business decisions where this Code has no specific guideline. In complying with this Code, employees should also consider the conduct of their family members and others who live in their household.
> In addition, each employee is expected to comply with all other Zuora policies and procedures that may apply to employees, many of which supplement this Code by providing more detailed guidance. Zuora may modify or update these specific policies and procedures from time to time, and adopt new policies and procedures in the future.
> Zuora expects all of its directors, executives, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to Zuora to help foster a sense of commitment to this Code among all of its employees, and to foster a culture of fairness, honesty and accountability within Zuora.

71.     The Code of Conduct provides that the Company not only prioritizes legal compliance, but that it considers it only the beginning of an employee's duties:

> Zuora's success depends upon each employee performing his or her duties to Zuora in compliance with applicable laws and in cooperation with governmental authorities. Zuora's success depends upon each employee operating within legal guidelines and

cooperating with authorities. It is essential that each employee knows and understands the legal and regulatory requirements that apply to Zuora's business and to his or her specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If any directors have any question in the area of legal compliance, he or she should approach the Chair (or, in the case of the Chair, Zuora's Compliance Officer), and if any employees have any questions in the area of legal compliance, they should approach their supervisor or Zuora's Compliance Officer immediately.

Legal compliance is only a part of Zuora's ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct. Zuora strives to act with the utmost integrity, not just in its most important corporate decisions, but also in the actions taken every day by its employees and directors. Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help Zuora become a better company, a better commercial partner for other companies, and a better corporate citizen.

72.    The Code of Conduct also provides that insider trading is illegal and unethical, directing employees to review its separate Insider Trading Policy guidelines.[3] The Code of Conduct states, in relevant part, that:

Every employee is prohibited from using "inside" or material nonpublic information about Zuora, or about companies with which Zuora does business, in connection with buying or selling Zuora's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, Zuora's Insider Trading Policy (the "Insider Trading Policy") and other Zuora policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Zuora business.

Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Zuora stock or other Zuora securities.
Please review the Insider Trading Policy for additional information.

73.    The Code of Conduct provides that the Company meets its disclosure obligations, and that:

Zuora's disclosure controls and procedures are designed to help ensure that Zuora's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present Zuora's financial condition and results of operations and are

---

[3] These guidelines are not publicly available.

timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist Zuora in producing financial disclosures that contain all of the information about Zuora that is required by law and would be important to enable investors to understand Zuora's business and its attendant risks, including, but not limited to:

- • no employee may take or authorize any action that would cause Zuora's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
- • all employees must cooperate fully with Zuora's finance department, as well as Zuora's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that Zuora's books and records, as well as its reports filed with the SEC, are accurate and complete; and
- • no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Zuora's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that Zuora makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- • act honestly, ethically, and with integrity;
- • comply with this Code;
- • endeavor to ensure complete, fair, accurate, timely and understandable disclosure in Zuora's filings with the SEC;
- • raise questions and concerns regarding Zuora's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;
- • act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
- • comply with Zuora's disclosure controls and procedures and internal controls over financial reporting.

74.    The Code of Conduct also provides special standards for "Senior Financial Personnel," a group that explicitly included Defendants Tzuo and Sloat as Zuora's CEO and CFO:

Zuora's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of Zuora. As such, the Board requires that the Chief Executive Officer and senior personnel in Zuora's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout Zuora as a whole that ensures the accurate and timely reporting of Zuora's financial results and condition. Because of this special role, Zuora requires that the Chief Executive Officer, Chief Financial Officer, Chief

Accounting Officer and any other people performing similar functions ("Senior Financial Employees"):

- Act with honesty and integrity and use due care and diligence in performing his or her responsibilities to Zuora.
- Avoid situations that represent actual or apparent conflicts of interest with his or her responsibilities to Zuora, and disclose promptly to the Committee, any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. Without limiting the foregoing, and for the sake of avoiding an implication of impropriety, Senior Financial Employees will not:
  - accept any material gift or other gratuitous benefit from a customer, business partner, supplier or vendor of products or services, including professional services, to Zuora (this prohibition is not intended to preclude ordinary course entertainment or similar social events);
  - except with the approval of the disinterested members of the Board, directly invest in any privately-held company that is a customer, business partner, supplier or vendor of Zuora where the Senior Financial Employee, either directly or through people in his or her chain of command, has responsibility or ability to affect or implement Zuora's relationship with the other company; or
  - maintain more than a passive investment of greater that 1% of the outstanding shares of a public company that is a customer, business partner, supplier or vendor of Zuora.
- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in Zuora's submissions to governmental agencies or in public statements.
- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.
- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

75.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of controls, gross mismanagement and violations of the Exchange Act and Securities Act, and failing to report the same.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

76.     Zuora is a technology company based in California that specializes in the research, design, and development of cloud-based subscription software for businesses.

77.     Zuora has two primary products: Billing, a subscription billing software, and RevPro, a revenue recognition software. While Billing was a 'home-grown' solution created by Zuora, RevPro was a part of the Company's acquisition of Leeyo in May 2017.

78.     Starting with its Prospectus—filed on April 12, 2018—the Company issued multiple statements through SEC filings, press releases, and conferences that led the investing public to believe that: (i) Billing and RevPro were integrated to allow for a seamless customer experience; (ii) the integration of Billing and RevPro would lead to cross-selling and upselling opportunities that would boost sales; and (iii) the market demand for RevPro would remain relatively strong after the deadline to implement ASU 2014-09 had passed.

79.     ASU 2014-09, also referred to as Topic 606 or "Accounting Standard Codification 606" ("ASC 606"), is a revenue recognition standard that affects businesses engaged in contracting with customers for the transfer of goods or services. It was jointly developed by the Financial Accounting Standard's Board and the International Accounting Standards Board. The guidance was originally issued in 2014 but has since been revised several times. The aim of ASU 2014-09 is to establish international alignment on the method by which businesses recognize revenue. Adherence with ASU 2014-09 is required in the United States by Generally Accepted Accounting Principles ("GAAP") for public entities.

**The Individual Defendants Had Knowledge that Billing and RevPro Were Not Integrated**

*Confidential Witness Statements*

80.     Numerous former employees of the Company were interviewed as confidential witnesses by counsel for plaintiffs in the Federal Securities Class Action. The statements attributed to these confidential witnesses below come from the Federal Securities Class Action's "Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws" (the "Class Action Complaint").

81.     For example, a former Senior Manager Global Services / Principal Solution Architect and Zuora Integration Architect, identified in the Class Action Complaint as CW-1, worked at Zuora from June 2017 until April 2019 and reported to the Company's Vice President, Global Services who in turn reported to the C-suite. CW-1 worked at Leeyo prior to its acquisition by the Company and thus had

prior knowledge of and experience with RevPro. CW-1's responsibilities at the Company included helping customers successfully implement RevPro to have it automate their revenue recognition process. CW-1 stated that customers complained about the lack of integration of Billing and RevPro and that the problem was caused by a source data problem that was due to Billing's design. Billing was not capable of generating the data needed to successfully use RevPro, and the Company did not have a solution to transport data generated by Billing into RevPro.

82. A former Zuora project manager/subject matter expert who worked at the Company from October 2017 until September 2018, referred to in the Class Action Complaint as CW-2, reported to Chief Information Officer ("CIO") Alvina Antar ("Antar") who in turn reported to Defendant Sloat. CW-2 described becoming aware of the problems integrating Billing and RevPro immediately on joining the Company. CW-2 corroborated CW-1's account regarding the source of the integration problem. CW-2 said of the data produced by Billing that: "There were some limitations; the data was not structured enough and not uniform." This created problems for getting the data from Billing into RevPro. As CW-2 further stated: "[The] Zuora platform is very open for companies to decide how to structure their subscriptions; [but] they did not integrate an engine to extract data and load it into RevPro."

83. CW-1 reported that work began internally on a solution to the integration problem around October 2017. These efforts began as part of Zuora's ZoZ project, which was an avenue the Company used to test new products or features before deploying them for customer use. According to CW-1, the early efforts to integrate Billing and RevPro involved the use of a software called "MuleSoft." However, it became apparent to CW-1 by the end of 2017 or in early 2018 that the MuleSoft solution would not work. CW-2 confirmed this account. According to CW-2, from fall of 2017 until May 2018, the Company attempted to make the MuleSoft solution work, but was ultimately unsuccessful. CW-1 noted that CIO Antar provided updates to Defendant Sloat on the ZoZ project, including the project to integrate Billing and RevPro and its failures. CW-1 further noted that Defendant Sloat participated in monthly ZoZ meetings in which these matters were discussed.

84.     CW-1 stated that at one such meeting, Defendant Sloat stated that the Company was "going to market as a combined product for ASC 606." Moreover, CW-1 stated that Defendant Sloat told those present at one ZoZ meeting that "Zuora needed to get its act together with RevPro." CW-2 confirmed that Defendant Tzuo and Sloat knew of the integration failures of the ZoZ project, despite public representations they made touting Billing and RevPro as *already* integrated. CW-2 noted the existence of multiple email threads and shared "Google documents" concerning ZoZ and the integration efforts, email threads and documents which the highest levels of management had access to. CW-2 further stated that CIO Antar would ensure Defendant Sloat was informed about these topics.

85.     CW-1 noted that the ZoZ project was able to produce a version of the MuleSoft solution for internal use, but that solution still required certain data to be "touched up" manually and had to then pass a two-year retest period internally.

86.     With this backdrop, in early 2018 the Company began a distinct Billing and RevPro integration project called "Keystone." According to CW-2, the Keystone project was primarily aimed at getting customer's Billing and RevPro data integrated. The Keystone team worked separately from the ZoZ project, which was primarily geared towards creating a solution for internal use.

87.     CW-1 noted that the Keystone project used a solution called "OrderMetrics" that was intended to replicate data from Billing in a way that could then be used by RevPro. However, OrderMetrics performed poorly at this task, and it often could not produce the relevant data that RevPro required to function properly. CW-1 noted that the Keystone solution would work for customers who used very few of Billing's features, but that "80 to 90 percent of customers would not be able to use the Keystone integration[.]" CW-1 noted that all levels of Zuora's management were aware of the Keystone project, and its limitations. Reports were prepared about the Keystone project, and these reports were provided to the Company's top executives, including as Google documents. Moreover, CW-1 noted that the Vice President – RevPro Product Line, Monika Saha, was present at weekly Keystone-related meetings, and that she would provide updates to her supervisor that would make their way to Defendant Tzuo.

88.    CW-2 noted that customers expected Billing and RevPro to be integrated based on information that the Company was promulgating. CW-2 said: "[B]asically they were putting out information to customers or in forums before having [the integration] built." But, as CW-2 continued, "the integration wasn't built, it wasn't tested, and it wasn't working." CW-2 noted that customers had bad experiences with the Company's non-integrated software, stating that Zuora "even lost a lot of business because based on what they had promised and what was not made[.]" CW-2 explained that: "If you seek a particular solution to do a certain job, then if a product doesn't do the job when you buy validation, you aren't going to get it. You're going to go for an alternate solution."

89.    CW-2 noted that there were multiple avenues by which Defendants Tzuo, Sloat, and Diouane would have been kept up-to-date on the integration status of Billing and RevPro. CW-2 stated that employee groups—such as the product group, the engineering group, and the sales group—held weekly forums where management was updated on things like the progress of software integration efforts. CW-2 stated that Defendant Diouane led the sales groups weekly forums and that Defendant Sloat regularly attended them. CW-2 said of customer complaints: "I'm sure if the client was generating a huge amount of revenue for that particular group, then it would be a top of mind discussion. If [Defendant Sloat] [was] in the sales group forum, that was the only topic [Defendant Sloat] would care about because that would be his bread and butter."

90.    CW-2 noted that many of these weekly forums produced meeting minutes, which were then circulated via email and Google documents. CW-2 reported personally receiving many such minutes and recalled that the topic of integrating RevPro and Billing regularly appeared in these minutes. CW-2 noted that Defendant Tzuo and Sloat would certainly have received the minutes, which sometimes contained references to discussion with them.

91.    In addition, CW-2 discussed "quarterly review meetings," with Defendants Sloat, Tzuo, and others present, where the status of the projects to integrate Billing and RevPro were discussed. These discussions also touched on the anticipated dates that RevPro would be available for internal use and for "GA"—general availability to the public.

92.    Moreover, CW-2 noted that Defendant Sloat was also updated regarding customer forums and customer focus groups saying that, "Sloat was informed about internal projects and road maps – at the C-level they share all the information."

93.    Zoom Video Communications, Inc. ("Zoom") was one of Zuora's key customer who had problems with Billing and RevPro not being integrated. CW-1 stated that Zoom was already considered one of the Company's most important Billing customers when it chose to add RevPro. CW-1 stated that Zoom had such bad experiences testing out RevPro that by late 2018 they had decided not to fully utilize it. Zoom's decision not to fully implement RevPro was a huge deal internally. According to CW-1, Zoom "stopped some payments as well," when they cancelled RevPro, and that Zoom's decision "was material enough to impact our bonus payments – our bonus was dependent on meeting our revenue target."

94.    Zoom was not the only customer having problems. CW-1 noted that PTC Inc., a software company, also reported having issues with the lack of Billing and RevPro integration. According to CW-1, Defendants Tzuo and Sloat, among others, were regularly updated on the integration problem, developments with RevPro more generally, and customers' experiences at weekly executive meetings. CW-1 noted that when Zoom stopped paying for RevPro, CW-1's supervisor had CW-1 attend a number of these meetings in late 2018 to discuss customizations that might help.

95.    Zuora's problems with its software translated into problems with its sales. An account executive employed by the Company from June 2018 until July 2019, referred to in the Class Action Complaint as CW-3, primarily sold Billing to new and existing customers on the West Coast in the United States. Of the integration between Billing and RevPro, CW-3 stated: "The dream and vision was for the two things to work together, but it hadn't been built . . . It was in the works, but took a long time and wasn't done by the time I left."

96.    CW-3 recalled some Zuora customers spending large sums of money to create their own personal data integration solutions for Billing and RevPro. CW-3 stated: "[C]ustomers were spending over $1 million because they had both Zuora and RevPro . . . They spent that to get the two systems to work together." CW-3 recalled that one such customer did so in part because they needed the software to

be integrated in order to take the company public. CW-3 did not specify which customers undertook this type of spending out of deference to their privacy, but noted that one such customer was a significant entity in the web conferencing market. Moreover, CW-3 noted that at least five other large customers were affected by the lack of integration, and that the size of their accounts made each a material concern for the Company's financial success.

97.     CW-3 said this topic was regularly discussed at team meetings. CW-3 stated "[i]n team meetings we spoke about accounts and my colleagues would say [their customers] aren't happy because of Keystone." CW-3 said that the integration issue was brought up at nearly all the sales team meetings which he attended, which were also attended by other account managers, vice presidents ("VPs"), and directors. CW-3 further noted that "[o]ur VP was in constant communication with the CEO [Defendant Tzuo] about customer feedback." CW-3's VP regularly informed CW-3 about the contents of his conversations with Defendant Tzuo, including their discussions about customers' dissatisfaction and the Keystone project.

98.     This dissatisfaction on the customer-side inevitably translated into reduced sales. CW-3 stated that companies who experienced problems with the integration of Billing and RevPro withheld payments as an expression of their unhappiness. CW-3 stated that the customer who was forced to create their own integration at great cost in order to go public refused payments and asserted that they "had to spend $1 million outside of us because [Zuora's software] didn't work." CW-3 was included on an email chain with Defendant Tzuo, in November or December 2018, informing him of this customer's actions and reasoning.

99.     A former Zuora employee who worked as a Business Development: Strategic Accounts Group Member from May 2018 until January 2019, referred to in the Class Action Complaint as CW-4, had a similar experience to CW-3. CW-4 worked on the team which focused on selling the Company's order-to-revenue platform: Zuora Central. CW-4 covered the Company's larger accounts, including IBM.

100.     While RevPro was acquired by Zuora prior to CW-4 joining the Company, CW-4 became familiar with RevPro prior to a conference in August or September of 2018. Moreover, CW-4 was

tasked with cross-selling RevPro to Zuora Central customers. CW-4 recounted discussions within Zuora of getting RevPro "into every Fortune 500 account and vice versa." However, CW-4 stated that once the Zuora Central sales team began succeeding in cross-selling RevPro to their customers, CW-4 began receiving negative feedback about RevPro from customers.

101.    CW-4 recounted, on multiple occasions, that account managers would attempt to demonstrate for an existing Billing customer how RevPro would work within the customer's system. Then, there would be technical difficulties in trying to utilize the customer's Billing data in RevPro and engineers would be brought in to troubleshoot.

102.    CW-4 expressed that this ran counter to the Company's messaging—that Billing and RevPro offered one integrated experience. CW-4 said: "The idea of RevPro was that you could go in-house with Zuora and use RevPro to take care of the backend accounting for complex accounting standards." CW-4 stated that Defendant Tzuo wanted RevPro to be "plug and play," meaning a customer using Zuora Central or Billing could immediately begin utilizing RevPro and that it would have cross-functionality with Zuora's other software offerings. However, this was clearly not the case. Data could not easily be translated from one program into the other. According to CW-4: "***It was clear the two technologies were not as capable of working together as the Company claimed***." (Emphasis added.)

103.    CW-4 noted that these problems led to twice weekly meetings of the Zuora Central and RevPro teams. At these meetings, CW-4 recalled that it was clear the RevPro team was struggling to make sales numbers and that the reason was the integration problem. Moreover, this problem was damaging the Company's reputation and making it harder to sell Zuora Central, according to CW-4. CW-4 said: "It was very clear that there were concerns with companies who had Zuora Central who heard about difficulties." In addition, as existing customers became aware of the problem with RevPro, this caused them to question whether Zuora was the right company for them, as, according to CW-4, there was "[t]his idea of a sticky sale, people are very aware of that in software – they pitch on a product that's hard to ditch, and you don't want to be stuck with Zuora Central if some product doesn't work."

104.    CW-4 recounted one situation in which a large enterprise customer who had purchased RevPro was considering adding Zuora Central. But when CW-4 spoke with a finance professional at the

customer-company, he was told "[b]ecause of what we're hearing [about the RevPro integration issue] we're not going to do it."

105.    By February or March of 2019, it was clear that customers were unhappy with RevPro, and that the Keystone project was not going to fix the RevPro problem. It was at that time that the Company decided to try for a new solution under the K-2 project. CW-1 worked on the beginning stages of the K-2 product before leaving the Company; this included completing a proof of concept in March 2019. After that, CW-1 stated that: "There was a directive that Tien [Tzuo] gave . . . to start K-2." CW-1 continued that: "We knew and Tien [Tzuo] knew, that OrderMetrics [i.e., the Keystone project] wasn't working."

106.

107.

108.

109.



Verified Consolidated Shareholder Derivative Complaint; 3:19-cv-05701-SI

116. ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

### *Core Operations Doctrine*

117.    In addition to evidence of the Individual Defendants' knowledge of the lack of integration between Billing and RevPro, discussed above, the Individual Defendants' knowledge can also be inferred given that Billing and RevPro directly involved Zuora's core operations. Almost all the Company's revenue is generated from the sale of its software and associated support services. Billing and RevPro were touted as the Company's "flagship products," reflecting their centrality to the Company's business model. Thus, as directors and officers at the Company, it is reasonable to infer that the Individual Defendants were aware of this critical issue involving Zuora's core operations. Because of their positions within the Company, the Individual Defendants must have known about the significant problem facing the Company's flagship products, a fact made clear by the statements of former Company employees. ███████████████████████████████████████

### False and Misleading Statements

### *Statements Maintained on the Company's Website Throughout the Relevant Period*

118.    Throughout the Relevant Period, the Individual Defendants caused the Company to maintain on its website several false and misleading statements about the Company and its products. In addition, the Individual Defendants promulgated a false and misleading "About Zuora, Inc." description of Zuora attached to Company press releases.

119.    As shown in the below image, Zuora's website stated that with "Zuora's subscription management technology" a customer could "quote, order, bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform."



120.    The Company's website also touted Zuora Central as a "***single platform for your order-to-revenue process and the connective tissue between your CRM and ERP*** [Customer Relationship Management and Enterprise Resource Planning]." Zuora's website continued that its platform "***easily connects the various applications in your order-to-revenue ecosystem***." (Emphasis added.)

121.    On May 4, 2018, the Company issued the following false and misleading "About Zuora, Inc." description in a press release:

> Zuora® provides ***the leading cloud-based subscription management platform that functions as a system of record for subscription businesses across all industries***. Powering the Subscription Economy®, ***the Zuora platform was architected specifically for dynamic, recurring subscription business models*** and acts as an intelligent subscription management hub ***that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition.*** Zuora serves more than 900 companies around the world, including Box, Komatsu, Rogers, Schneider Electric, Xplornet and Zendesk. Headquartered in Silicon Valley, Zuora also operates offices in Atlanta, Boston, Denver, San Francisco, London, Paris, Beijing, Sydney,

Chennai and Tokyo. To learn more about the Zuora platform, please visit www.zuora.com.

(Emphasis added.)

122. Such description of the Company and its products was not true, and the Individual Defendants knew that was the case. Billing and RevPro were not integrated and thus the Company was not offering an automated order-to-cash process. Instead, and as multiple customers complained about, users of Billing and RevPro either had to manually extract and reenter data, or else create their own solutions at great cost.

123. Despite this statement not being true, the Company repeated it in numerous additional press releases issued after May 4, 2018. This statement, or extremely similar statements, were made in press releases issued by the Company on May 31, 2018; June 5, 2018; July 30, 2018; August 1, 2018; August 30, 2018; October 5, 2018; October 11, 2018; November 1, 2018; November 29, 2018; December 11, 2018; January 8, 2019; January 15, 2019; January 29, 2019; February 4, 2019; February 6, 2019; February 13, 2019; February 19, 2019; February 20, 2019; March 6, 2019; March 8, 2019; March 13, 2019; March 21, 2019; March 22, 2019; April 29, 2019; May 3, 2019; and May 13, 2019.

124. The statements identified above in ¶¶ 119–21 and 123 were false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated and; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company. Thus, the Company did not offer a single, automated platform that could handle a customer's accounting from "order-to-revenue."

### *April 12, 2018 Prospectus*

125. On April 12, 2018, Zuora filed the Prospectus with the SEC. The Prospectus touted the Company's software as one that "automates and orchestrates" a customer's accounting, even as the failed integration of Billing and RevPro materially prevented a seamless customer experience. The Prospectus describes the Company as:

1
2
3

Architected specifically for dynamic, recurring subscription business models, ***our solution functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition.*** Our cloud-based software solution is the new system of record for subscription businesses.

4

(Emphasis added.)

5
6
7
8
9
10
11
12

126.    The Prospectus highlighted other purported benefits of using Zuora such as a "flexible pricing model and automated billing, streamlined collection, and ***efficient accounting features***." (Emphasis added.) Moreover, the Prospectus touted the Company's "Competitive Strengths" as including a ***"[c]omprehensive solution built specifically to handle the complexities of subscription business models***" and later reiterated that Zuora's "solution functions as ***an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process*** and is architected ***specifically for dynamic subscription business models***" and displayed the following graphic depiction of the Company's "solution":

13
14
15
16
17
18
19
20
21



22

(Emphasis added.)

23
24
25
26
27
28

127.    The Prospectus further highlighted that "[u]nlike many legacy ERP systems, Zuora was ***built specifically to handle the complexities of subscription business models from customer acquisition to financial records close***, and it has become the system of record for managing subscriptions for our customers." (Emphasis added.) Zuora's "solution enables customers to successfully" to many tasks including "***[b]ill accurately with automated invoices*** that reflect everything

from up-to-date proration and plan changes to usage-based billing" and "*[a]ccount for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time.*" (Emphasis added.)

128.    The Prospectus also stated that the Company "*can deploy and configure our portfolio of order-to-cash products* [including Billing and RevPro] *to meet a wide variety of use cases* for subscription business models." (Emphasis added.) The Prospectus also stated that the Company's products would "Free Up IT and Engineering Resources" since "*engineering and IT departments no longer need to build in-house custom systems or customizations* for their ERP systems to keep up with market changes, ongoing customer demands, and new order-to-cash processes." (Emphasis added.)

129.    In addition, the Prospectus noted that "*[o]nce customers are operating on our solution, we have multiple ways to expand* our footprint and drive revenue growth from these customers, which we refer to as upsell[.]" (Emphasis added.) Upselling includes *"[c]ustomers that started with Zuora Billing or Zuora RevPro can also subscribe to the other flagship product[.]"* (Emphasis added.)

130.    The Prospectus also identified certain key elements to Zuora's growth strategy which includes "multiple ways to expand our footprint and drive sustainable growth with" existing customers. Specifically, Zuora touted its ability to "increase[e] transaction volume and upsells and cross-sells with additional products and services." Moreover, the Company was "focus[ed] on acquiring new customers through our flagship products, *Zuora Billing* and *Zuora RevPro*[.]" and noted that "with many industries transitioning to subscription business models, we believe we are well-positioned to acquire customers, as businesses increasingly realize that their existing systems are insufficient."

131.    These statements contained in the Prospectus, identified in ¶¶ 125–30 above, were false and misleading because: (1) despite representations to the contrary, Billing and RevPro were not integrated and; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company. Thus, the Company did not have a seamless "order-to-cash" platform that could handle a customer's accounting from billing through revenue recognition since it failed to maintain one integrated platform capable of doing so. Additionally, while the Prospectus touted that "engineering and IT departments no longer need to build

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in-house custom systems or customizations," as CW-3 recounted above, many of the Company's customers had to do exactly that given the lack of integration. Finally, while the Company touted its two flagship products and the opportunity to upsell or cross-sell other Zuora products to Billing and RevPro users, the truth was that Billing and RevPro were not integrated and customers experienced numerous undisclosed problems when trying to use the two software offerings together.

***April 12, 2018 Facebook Post***

132.    Also on April 12, 2018, the Company posted to its Facebook page a message touting that customers could "[r]un your dynamic order-to-cash platform on one central platform."



***May 31, 2018 Earnings Conference Call***

133.    On May 31, 2018, the Company held an earnings conference call with investors and analysts to discuss the financial results for the quarter ended April 30, 2018. On that call, Defendant Tzuo stated:

> [W]e continue to offer ***the only complete subscription management solution***, 100% focused on helping companies of all sizes launch, scale, and transform into a subscription business. Third, we continue to believe that the changing expectations around IT architectures are creating a once-in-a-generation opportunity for us to build an enduring enterprise software company. And lastly, for investors, for you, we continue to see an investment in Zuora as a portfolio play on this entire subscription economy.

(Emphasis added.)

134.    Defendant Sloat also highlighted Zuora's "cloud-based software that enables any company in any industry to successfully launch, manage, and transform into a subscription business."

135.    Defendant Tzuo continued by highlighted the Company's supposedly automated order-to-cash process:

Now, all of our products are underpinned, of course, by *our Zuora Central Platform. It's a dynamic hub designed specifically to orchestrate and automate the entire subscription order-to-cash process. This is done through our six core engines, including our pricing engine, subscription order, rating, global payments, subscription metrics, and subscription accounting. All contributing to make our solution the system of record around the transactional data for the customer.*

Now why is this important? Because when you look at our customers and you see how they are standardizing on a CRM system, plus Zuora Central, *plus an accounting system all in the cloud, you could see an emerging three-cloud architecture that modern companies are using to run these modern business models.*

(Emphasis added.)

136.     When asked by an analyst about Zuora's annual revenue and subscription guidance being "materially above . . . the street," Defendant Tzuo said: "We're betting on a big trend of the shift of the subscription-based business model. And as the only company that provides a full solution, 100% focused on this business, we're kind of a portfolio play on the subscription economy."

137.     During the call, another analyst inquired about the demand for RevPro and the implementation of ASC 606. Defendant Tzuo responded by touting RevPro as being a "sophisticated" solution for which the Company saw "long-term demand." Specifically, Defendant Tzuo said:

*ASC 606 was certainly a fantastic catalyst. It really put the spotlight on why revenue recognition is complex.*

We're still seeing a big tail for that, but I think *what really excites us about the market opportunity for revenue recognition is that the overall trend is not going away.* What's happening in the marketplace is when you use to sell products on a transaction basis, revenue recognition was pretty simple.

But more and more, that's not how businesses work. They've got these dynamic business models based around subscriptions, based around customers, based around services. *And we see really long-term demand for more sophisticated revenue recognition solutions. And as a leading player of the market, we are truly excited.*

(Emphasis added.)

138.     Responding to the same question, Defendant Sloat also said:

Yes, I'll take the financial result. We're not breaking out the RevPro-specific billings and revenue. However, *we do see a lot of tailwinds in the business*. The deferred revenue hasn't come all the way through from what we purchased, but *we are now looking at a lot of customers that have continued demand for both of our flagship products.*

---

We did talk about the professional services and I gave you those numbers because I do think that's important to see the trail-off of the 605 to 606 customers that are upgrading. Because we look at that as one-time as opposed to attached to a new business. ***But in general, we saw a strong demand for both products across the board.***

139.     Also during the call, another analyst called the Company's 112% revenue retention rate "quite strong" and asked how much of this retention was "upsell from transaction volume versus add-on adoption." Defendant Tzuo answered that Zuora "not only attract[s] brand new logos, companies that are entering the subscription economy, but also continue[s] to drive growth within our installed base." He continued that Zuora has "created really a multipronged strategy to do that. ***We have our add-on products certainly; we can cross-sell our two flagship products where you can start with billing and we can come back and sell you RevPro or vice versa. And we have a set of add-on products.***" (Emphasis added.)

140.     Responding to a follow-up question about the Company's revenue retention, Defendant Sloat stated:

But it feels really good. There was no meaningful change either in terms of the mix of the upsell and where it was coming from. ***There's just strong demand all the way around for both add-on products, both flagship products, and then volume.*** I mean, you can see the volume increase that we talked about: over $7 billion of process volume in Q1. These are all positives across the board.

(Emphasis added.)

141.     The statements identified above in ¶¶ 132–40 were false and misleading. The ASC 606 implementation deadline for companies was a significant short-term driver of RevPro sales, and the Company was not likely to see continued strength in long-term demand as time passed. Moreover, Billing and RevPro were not integrated and thus the Company did not have the "complete subscription management solution" as advertised. As a result, the Company's "cross-selling" and "upselling" efforts were hindered by offering to supposedly complementary products that did not work well together. Thus, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the

Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### June 5, 2018 Press Release

142.    On June 5, 2018, the Company issued a press release titled "Zuora Central Upgrade Further Attaches the ERP Market. This press release called Zuora Central the "***first and only complete subscription order-to-revenue solution*** on the market" and stated that companies using Zuora "can rapidly acquire customers across multiple channels, ***seamlessly manage the entire customer lifecycle, and automate revenue recognition, in a single solution.***" (Emphasis added.)

### June 5 and June 11, 2018 Tweets

143.    On June 5, 2018, the Company's Twitter account posted the following false and misleading tweet concerning the supposed integration between RevPro and Billing:



144.    Again, on June 11, 2018, the Company's Twitter account posted the following false and misleading tweet, which graphically depicted RevPro and Billing as integrated:

1

2



3

4

5

6

7

8

9

10

11

12

### *June 13, 2018 Form 10-Q*

13

145.    On June 13, 2018, the Company filed with the SEC its quarterly report for first fiscal

14

quarter ended April 30, 2018 on Form 10-Q (the "1Q19 10-Q"), which was signed by Defendant Sloat.

15

Attached to the 1Q19 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the

16

Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Tzuo and Sloat,

17

attesting to the accuracy of the 1Q19 10-Q.

18

146.    The 1Q19 10-Q said, in relevant part:

19

> We provide cloud-based software on a subscription basis that enables any company in
> any industry to successfully launch, manage, and transform into a subscription business.
> Architected specifically for dynamic, recurring subscription business models, ***our
> solution functions as an intelligent subscription management hub that automates and
> orchestrates the subscription order-to-cash process, including quoting, billing,
> collections, analytics, and revenue recognition.*** We offer businesses the ability to meet
> the constantly-evolving needs of their subscribers, capitalize on new revenue
> opportunities, and accelerate business growth.

20

21

22

23

24

(Emphasis added.)

25

26

27

28

*August 30, 2018 Earnings Conference Call*

147.    On August 30, 2018, Zuora held a conference call to discuss the Company's financial results of the second fiscal quarter ended July 31, 2018. During the call, Defendant Sloat discussed how Defendant Tzuo had previously identified a "vision for Zuora:"

> If you think back 5 months ago, and you're at our road show, you basically laid out our vision for Zuora. And it really boiled down to 3 things: first, that the shift to Subscription Economy is a global trend and it's happening across all industries and all geographies; second, ***Zuora has built the only complete subscription management solution focused 100% on helping companies of all sizes, launch, scale and transform into a subscription business***; and finally, as a result, we are the portfolio at play across the entire Subscription Economy. And as a result of that, we have a unique opportunity to deliver sustainable long-term growth and build a great business. So question, if we were doing a road show presentation today, would you be saying the same exact things?

(Emphasis added).

148.    Defendant Sloat later defended the Company as a good long-term investment, due to the need for enterprises on a subscription model needing revenue recognition software like RevPro, stating:

> I think we're seeing 2 things. One, ASC 606 and IFRS 15 is a good driver for customers kind of last year when we talk about 605, 606 upgrade, but what we're seeing is that companies had a time line. They had to get compliant and a lot of them chose to do that through kind of some manual band aid process, what we call. So we're seeing those guys now. They've gone through their first integration. But ***they know it's not sustainable, and they're going to need the revenue automation solution for 606 going forward. So those customers are still out there. But on top of that, it's all about -- the reason we did the acquisition was not 606. It is about business model complexity that hits both your quote-to-cash solution as well as your revenue automation.*** And that's really what we're seeing right now or the Hitachi example of that Tien [Tzuo] touched on that, that's all about just complexity and manual processes. And ***they wake up -- a customer wakes up, and they realize they've outsourced all revenue to some other place, and they've got tens and tens of bodies doing this all manually. And that's not sustainable. And so that's where I think that the long kind of like tailwinds are going to be for 606 -- for RevPro***.

(Emphasis added.)

149.    Defendant Tzuo, also on the call, touted the Company's experience in onboarding RevPro customers who needed an ASC 606 solution:

> Again, we feel good. I mean -- so when we look at this year, the company has grown significantly as an independent company, and they have never raised a venture amount and so have limited ability to invest, and we've been able to invest in that business. And

so -- look, when we pull back and *you ask yourselves which company out there really has the most 606 experience, and I would bet that it's this team. They've done, I mean, dozens or scores of 606 implementations. Ask around for all the tech companies that you guys cover. Chances are they're using RevPro for revenue recognition. And so that expertise is an asset, especially when we can apply more distribution capability against their products.*

(Emphasis added.)

### September 12, 2018 Form 10-Q

150.    On September 12, 2018, the Company filed with the SEC its quarterly report for the second fiscal quarter ended July 31, 2018 on a Form 10-Q (the "2Q19 10-Q"), which was signed by Defendant Sloat. Attached to the 2Q19 10-Q were SOX certifications signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 2Q19 10-Q.

151.    The 2Q19 10-Q said, in relevant part:

We provide cloud-based software on a subscription basis that enables any company in any industry to successfully launch, manage, and transform into a subscription business. Architected specifically for dynamic, recurring subscription business models, *our solution functions as an intelligent subscription management hub that automates and orchestrates the subscription order-to-cash process, including quoting, billing, collections, analytics, and revenue recognition.* We offer businesses the ability to meet the constantly-evolving needs of their subscribers, capitalize on new revenue opportunities, and accelerate business growth.

(Emphasis added.)

152.    The statements identified above in ¶¶ 142–51 were false and misleading. Billing and RevPro were not integrated and thus the Company did not have the "first and only complete subscription order-to-revenue solution" that could "seamlessly manage the entire customer lifecycle." Moreover, though the ASC 606 implementation deadline for companies was a significant short-term driver of RevPro sales, the Company was not likely to see continued strength in long-term demand. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new

1
2
3
4

accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

5
6

**November 29, 2018 Earnings Conference Call**

7
8
9

153.    On November 29, 2018, Zuora held an earnings conference call to discuss its financial results for the third fiscal quarter ended October 31, 2018. On the call, Defendant Tzuo discussed Billing and RevPro as "both based on a simple concept to automate the financial complexities generated by subscription models," stating:

10
11
12

[Billing and RevPro are] ***both based on a simple concept to automate the financial complexities generated by subscription models*** that are highly, highly differentiated and mission-critical for our customers.

13
14

. . .

15
16
17
18

So what we're finding is that ***many public companies rush to get compliance, but a lot of them did so manually with spreadsheets***, and they found this to be a short-term Band-Aid solution. These companies are realizing that the real problem with never ASC 606. The bigger, more systemic trend is that these companies were struggling to scale their revenue operations ***because of all these new flexible-consumption recurring models that the companies were launching, and they couldn't do it with a manual Excel-based approach. ASC 606 was the thing that only highlighted the problem.***

19
20
21
22
23

…

So you can see that the underlying demand hasn't gone away, ***but our value proposition is now more centered around automation and efficiencies versus simply compliance***. [It's nice to see] this quarter, we also signed on other public companies like Carbonite and Pivotal who both chose RevPro all because we got the best revenue automation platform on the market, and ***there's a big, big difference between being compliant and being competitive.***

24

(Emphasis added.)

25
26

154.    Defendant Sloat similarly discussed the need of Zuora customers for revenue recognition software, stating:

27
28

[T]hat was the reason to bring on the RevPro product in the first place. ***The need for revenue automation is not just driven by ASC 606 compliant. It's a larger issue*** with

43

many of these companies as the complexity of revenue recognition limits their ability to efficiently scale and meet their business goals. ***That's why we continue to see good demand for our RevPro product.***

155.    Responding to an analyst question about the Company's retention, Defendant Tzuo stated:

So you obviously understand SaaS [Software-as-a-Service] companies with subscription model, churn is going to have a big swing effect. So it's something that I wouldn't say there's anything that we put in place in the last 90 days, but it's obviously a huge focus of ours, and we hope to continue to show continuous improvements year-over-year on these numbers. And so we feel really good. ***I think we benefited from the fact that we have a very sticky product, and when you look at our product, once it goes in, whether it's on billing on the revenue recognition side, right, it's sticky. It's running company's core operations. It's the heart of the businesses. And so the 2 factors for us that influence churn are, one, how are well are we doing bringing customers live, and that's where we continue to show improvements year-over-year.***

(Emphasis added.)

### December 1, 2018 TheStreet.com Article

156.    On December 1, 2018, TheStreet.com published an article titled: "Zuora's CEO and CFO Talk to The Street About Their Firm's Growth Outlook and More." The article included the following statement from Defendant Tzuo:

When asked about Billing and RevPro cross-selling, Tzuo indicated that the percentage of clients using both solutions (said to be below 10% three months ago) is still low. But he added that the company did successfully cross-sell RevPro to some major clients last quarter, such as Pivotal Software and Carbonite, and argued that the challenges involved financially managing subscription businesses will drive additional traction.

***"I think the broader message is, companies are realizing [that] these new business models...are just wreaking havoc in their financial operations," he said. "And the two key areas that [they're] wreaking havoc on is billing and revenue recognition."***

(Emphasis added.)

### December 11, 2018 Press Release

157.    On December 11, 2018, the Company issued a press release titled, "Zuora Announces its Winter '19 Release." The press release highlighted the Company's "***focus on automation*** and usability ***across Zuora Billing, Zuora Collect, and Zuora RevPro***" and stated that Zuora's software brought "***greater automation to help finance teams increase productivity***[.]" (Emphasis added.) This included:

- • Reduced time spent on billing tasks and complex account updates with automated workflows
- • Easier collaboration amongst collection teams to resolve unpaid invoices and at-risk accounts
- • More efficient month end close to meet ASC 606 revenue compliance through disclosure reporting and intelligent exception handling
- • Faster turnaround to create new automated processes, such as applying late fees, calculating usage, or previewing upcoming invoices, using the enhanced workflow user interface

### *December 13, 2018 Form 10-Q*

158.    On December 13, 2018, the Company filed with the SEC its quarterly report for the third fiscal quarter ended October 31, 2018 on a Form 10-Q (the "3Q19 10-Q"), which was signed by Defendant Sloat. Attached to the 3Q19 10-Q were SOX certifications signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 3Q19 10-Q.

159.    The 3Q19 10-Q said, in relevant part:

We provide cloud-based software on a subscription basis that enables any company in any industry to successfully launch, manage, and transform into a subscription business. Architected specifically for dynamic, recurring subscription business models, ***our solution functions as an intelligent subscription management hub that automates and orchestrates the subscription order-to-cash process, including quoting, billing, collections, analytics, and revenue recognition.*** We offer businesses the ability to meet the constantly-evolving needs of their subscribers, capitalize on new revenue opportunities, and accelerate business growth.

(Emphasis added.)

160.    The statements identified above in ¶¶ 153–59 were false and misleading. Billing and RevPro were not integrated and thus the Company did not have a seamless order-to-revenue solution. Because they were not integrated, Billing and RevPro sometimes contributed to, rather than alleviated, the "havoc" a Zuora customer might experience in trying implement a streamlined solution for billing and revenue recognition. Moreover, though the ASC 606 implementation deadline was a short-term driver of RevPro sales, the Company was not likely to see continued strength in long-term demand. Therefore, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect

the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### January 15, 2019 Needham Growth Conference

161.    On January 15, 2019, Defendant Sloat attended the Needham Growth Conference on behalf of the Company. At the conference, Defendant Sloat described the Company in the following terms:

> Sure. So, if you're not familiar with Zuora and what we do, because the name explains everything, obviously. ***We are really the only public company focused on subscription management.*** So, what do we mean by subscription management? We are a software company. ***Our platform allows our customers to launch, manage and grow their subscription base. That gets reflected often times in the word Billing because it happened to be a very complex transaction set that comes out of it. And that's one of our two flagship products. Our other flagship product is Revenue Recognition.***

(Emphasis added.)

162.    Defendant Sloat continued by discussing the supposed upselling and cross-selling opportunities that Zuora enjoyed, saying: "But on the upsell component, ***it is a mix of companies buying other products where you could be a Billing customer and you're buying RevPro or vice versa. We still have less than 10% overlap of our customer base using both of our flagship products, but we do see a lot of traction starting there.***" (Emphasis added.)

163.    Defendant Sloat also discussed how RevPro was acquired to complement the Company's existing functionality, stating:

> We bought the Leeyo business; ***we brought on the RevPro product not because of ASC 606, even though there is a great tailwind behind that. We brought it on because we know that there's a lot of complexity that's driven from subscription business models and it breaks your downstream revenue***, and we were seeing as for our customer base. In fact, ***our customer base is coming to us and say, hey, if you can't solve this for us, we're going to have to go figure out how to solve it ourselves. We had always had billing-based revenue recognition, but ASC 606 demands bookings based revenue recognition, and that is what the RevPro product does.*** We knew all the players in that market and we had partnered with a lot of them, Leeyo was already a partner and we brought them on board. In our last call, we highlighted a couple of companies – a couple

of existing billing customers that brought us on for RevPro. ***But we also highlighted public companies like Veeva who had already gotten ASC 606 compliant but then brought us on for RevPro because to point [out] a lot of companies are actually putting band-aids on this solution, they're using Excel to get compliant, and again to the first audit, but they realize that is not a sustainable solution, and that there's a ton of manual processes and those manual processes inevitably will force companies to bring in an actual software solution to manage those for them.***

(Emphasis added.)

164.    Defendant Sloat also took the time to assure those listening that the Company was up to the task of handling the complexities of revenue recognition, stating:

Yeah. Yeah, the revenue recognition – the complexity is coming around the different charge models that they have and the different – the way the company will sell, right. And then now, with ASC 606, you got have to be able to quantify everything and come off the SSP for every single product that you sell and then you have to be able to kind of itemize them out so when you bring it into the system, they could actually look at the whole order and then what the potential incremental buys of the customer might make against that order. ***What we find is that companies, if they think it's very simple as you dig through and you look historically how the way they sell and you actually kind of itemize every single, what we call charge model, that's where the complexities come in. We can still to handle them; you've just got to be able to actually document them all.***

(Emphasis added.)

***February 13, 2019 Goldman Sachs Conference***

165.    On February 13, 2019, Defendant Tzuo attended the Goldman Sachs Technology & Internet Conference on behalf of the Company. At the conference, he described Zuora as follows:

So it's -- the SIs are really, really important for what we do, right. If you look at what we did, it's digital transformation, in these companies. And so yes, ***there's a billing revenue recognition subscription management engine, but there's a broader business model transformation,*** there's a broader process transformation.

…

But from a long-term perspective, it is these big implementations where you go into a company and you transform what the company does, and you're running the company's business. These are the true, true big, sticky implementations that carried Oracle through, right, decades, it's carried SAP through decades. And that's our world. And the SIs are definitely a big, big part of that world. And so we started talking about that, right, a couple of quarters ago on an earnings call, highlighting projects and accounts where we're working together, and we've signaled that you're going to see that trend continue to increase, right, just on a natural basis.

(Emphasis added.)

166.    An analyst from Goldman Sachs asked the following question about upselling and cross-selling opportunities that the Company enjoyed:

> From a product perspective, you got your core billing product, and through an acquisition, you added RevPro, which helps companies gets ASC 606 compliant. I think the attach rate for RevPro is about 10% today, but given the importance of companies becoming compliant with 606, can you talk about the path of that, that attach improving over time?

167.    Defendant Tzuo responded to this question by stating:

> **[W]e understand how to do this on the billing side. At a high level, it's the same idea on the revenue recognition side, but it was complex enough, we said, look, we -- we get this great partner that our customers are using, and we wound up acquiring these guys.** But if you think about the level of billing complexity that we absorb -- **revenue complexity is probably like another order of magnitude higher. And it's not going away, right? It's not going away.** So people think okay, well this is just a compliance thing, right? So like the old GRC thing, where there's a period in time or a SOX thing, where you have to put in ASC 606 compliant solution, and you put it in, and you're done. No it's not ASC 606, it's the complexities of all these new business models that are destroying the finance department.

(Emphasis added.)

### February 26, 2019 Morgan Stanley Technology, Media & Telecom Conference

168.    On February 26, 2019, Defendant Sloat attended the Morgan Stanley Technology, Media & Telecom Conference on behalf of the Company. At the conference, Defendant Sloat called Zuora, the "only pure play business doing what we do, which is **essentially enabling our customers to launch, manage, transform [and] account for their subscription business.**" (Emphasis added.)

169.    Moreover, Defendant Sloat stated that Zuora's software was "designed to think about [Zuora's] **customer and the entire transaction set around the customer**," including a "complete re-architecture" from a customer's past system. (Emphasis added.)

170.    In addition, Defendant Sloat touted the Company's automated processes as helping to "transform" a customer's business model, stating:

> Yeah. So there are still different buyers, like the RevPro sales got a technical accounting, so we're selling to a controller ahead of revenue or something like that and trying to solve a specific problem. That specific problem is revenue automation. Now**, the reason we did that is our customers were actually telling us, hey, we need your help in solving our**

*revenue problem, and with ASC 606 revenue problem much more complex*, but the reality is the long game is that in business model *transformation in a subscription model*, and I should clarify, subscription, we're talking, $10 a month, $120 a year, we are talking about a customer centric model that can have any kind of charge model that's surrounding it that you want, it could be premium all the way to pure usage. ***And the simple subscription is part of it clearly, but that complexity that that happens here breaks a lot of downstream things. And one of those things is revenue. And so the premise is that every billing customer will eventually need a revenue automation solution.***

(Emphasis added.)

171.    Discussing his thoughts about the Company going forward, Defendant Sloat said:

So I think it still holds that *the complexity will break your revenue automation regardless of ASC 606 or not. I don't think the tail end of ASC 606 is done.* We highlighted a company on our Q3 call that it gotten ASC 606 compliant through spreadsheets, which a lot did because they ran out of time. Yet, the ASC 606 is not like socks where you kind of get [indiscernible] (00:22:56) doing some ongoing validation. ASC 606 you actually have to get audited every single year and things like SSPs and things like that can change. *And so you actually have to have a solution that can spit out a number. Ironically, I think it's going to be like a lot of work for a lot of companies to get to that auditable solution, yet still may not change the numbers. But you have to go through the work to prove it. So we feel pretty good about it.*

(Emphasis added.)

172.    The statements identified above in ¶¶ 161–65 and 167–71 were false and misleading. Billing and RevPro were not integrated and thus the Company did not have a seamless order-to-revenue solution as it was leading customers and investors to believe. Moreover, though the ASC 606 implementation deadline was a short-term driver of RevPro sales, the Company was not likely to see continued strength in long-term demand. Thus, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the

Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### March 21, 2019 Earnings Conference Call

173.    On March 21, 2019, Zuora held an earnings conference call to discuss its financial results for the fourth fiscal quarter and year ended January 31, 2019. During that call, Defendant Tzuo called Zuora the "***only game in town if you're looking for a complete end-to-end subscription platform, including billing and revenue recognition***." (Emphasis added.) Moreover, Defendant Tzuo called the Company the "only choice when it comes to putting the platform to drive [] growth" for subscription businesses. In addition, Defendant Tzuo stated that Zuora was "scaling our business and getting more efficient while we're doing it."

174.    An analyst asked Defendant Tzuo: "[W]here do you feel you are in terms of from a sales execution standpoint? What's left as far as sales hiring? Where are you hiring? And particularly, around aligning the existing RevPro sales force and the Zuora billing sales force, where are you there as well?" Defendant Tzuo responded:

> We feel really good. I mean we have a whole team in place now that's taking our learnings of how to make this business model work. ***And we have 2 big competitive moats***. ***One is obviously the technology***, and the other one, we believe that's just as important is our go-to-market expertise of how to engage with companies and how to help them understand what are the elements . . . . But we think we got knowledge. We've got a whole team that knows how to find the right folks, bring them onboard. We're doing a good job of hiring. We're doing a good job at enablement. We scaled this worldwide already. It was important for us to break through the international learnings actually before we went public, and so you're seeing our international business growing really, really well. But we feel good about where it is.

(Emphasis added.)

### April 18, 2019 Form 10-K

175.    On April 18, 2019, the Company filed the 2019 10-K with the SEC. The 2019 10-K was signed by Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil. Attached to the 2019 10-K were SOX certifications signed by Defendants Tzuo and Sloat, attesting to the accuracy of the 2019 10-K.

176.     The 2019 10-K repeated past statements regarding the Company and its software, stating:

Zuora is a leading cloud-based subscription management platform. ***We provide software that enables companies across multiple industries and geographies to launch, manage or transform to a subscription business model. Architected specifically for dynamic, recurring subscription business models, our cloud-based software functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-revenue process, including billing and revenue recognition.*** Our solution enables businesses to easily change pricing and packaging for products and services to grow and scale, to efficiently comply with revenue recognition standards, and to build meaningful relationships with their subscribers.

(Emphasis added.)

177.     The 2019 10-K contrasted Zuora's supposedly more contemporary approach with its competitors' approaches, stating: "Many of today's enterprise software systems that businesses use to manage their order-to-revenue process were built for a product driven economy, and are extremely difficult to reconfigure for the dynamic, ongoing nature of subscription services."

178.     The 2019 10-K, like the Prospectus, highlighted as a "Competitive Strength" the Company's "[c]omprehensive solution ***built specifically to handle the complexities of subscription business models***." (Emphasis added.) This comprehensive solution, per the 2019 10-K, "functions as an intelligent subscription ***management hub that automates and orchestrates the entire subscription order-to-revenue process***" and is "[a]rchitected specifically for dynamic subscription business models." (Emphasis added.)

179.     Moreover, the 2019 10-K noted that Zuora can configure its products for a variety of client systems, stating: "We can deploy and configure our portfolio of order-to-revenue products [including Billing and RevPro] to meet a wide variety of use cases for subscription business models."

180.     The 2019 10-K also stated that the Company's products would "Free Up IT and Engineering Resources" since "***engineering and IT departments no longer need to build in-house custom systems or customizations*** for their Enterprise Resource Planning (ERP) systems to keep up with market changes, ongoing customer demands, and new order-to-cash processes." (Emphasis added.)

181.     The statements identified above in ¶¶ 173–80 were false and misleading. Billing and RevPro were not integrated and thus the Company did not have the "complete end-to-end subscription

platform, including billing and revenue recognition" that it was leading customers and investors to believe. In addition, some of Zuora's customers actually did have to build their own in-house customizations to get Billing to work with RevPro, despite the 2019 10-K explicitly saying that using the Company's software would help a customer avoid that outcome. Moreover, though the ASC 606 implementation deadline was a short-term driver of RevPro sales, the Company was not likely to see continued strength in long-term demand. Thus, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 8, 2019 Proxy Statement

182.    The Company filed its 2019 Proxy Statement with the SEC on May 8, 2019. Defendants Fenton, Goldman, Haley, Pressman, Tzuo, Volpi, and Yesil solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

183.    The 2019 Proxy Statement stated, regarding the Company's Code of Conduct, that:

We are committed to ethical business practices and, accordingly, we have adopted a Global Code of Business Conduct and Ethics (Code of Conduct) that applies to all the members of our Board of Directors, officers and employees. Our Code of Conduct is available on our website at *https://investor.zuora.com/governance/governance-documents.* We intend to disclose future amendments to certain portions of the Code of Conduct or waivers of such provisions granted to executive officers and directors on our website, as permitted under applicable New York Stock Exchange and SEC rules.

184.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

185.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to incentivize "growth of sustainable long-term value for our stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

186.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls.

187.    As a result of the foregoing false and misleading elements of the 2019 Proxy Statement, Company shareholders voted, *inter alia*, to elect Defendants Haley and Yesil to the Board, allowing them to continue breaching their fiduciary duties to the Company.

### The Truth Emerges

188.    On May 30, 2019, Zuora issued a press release regarding its financial results for the first fiscal quarter ended April 30, 2019. In the press release, Zuora lowered its revenue guidance for fiscal year 2020 to $268–278 million, from its prior estimate of $289–293.5 million. Zuora also lowered its subscription revenue guidance to $200–206 million from $209–211.5 million. Moreover, the Company revealed that its revenue growth was only 22%—down 18% from the previous quarter.

189.    In addition, Zuora revealed that it had only added twenty customers with contract values over $100,000, the Company's worst performance on this metric since becoming public. Adding to its worries, Zuora reported a loss of $20.6 million, or a year-over-year loss of 16%. Finally, the Company revealed that Defendant Diouane was being replaced as President and Head of Sales.

190.    The same day, the Company held a conference call with analysts and investors. Defendant Tzuo acknowledged that Zuora "did have some challenges which are impacting our Q2 and

our full year outlook." Specifically, Defendant Tzuo noted "two execution headwinds": the lack of integration between Billing and RevPro and problems with the Company's sales team.

191.    Defendant Tzuo discussed how the integration between Billing and RevPro was "taking longer than expected." Specifically, he said "the technical work to complete the integration is taking time as these are complex mission-critical systems. And so for our existing Billing customers, who have recently purchased RevPro, we slowed down the RevPro implementations this past quarter given the product integration delay."

192.    Defendant Tzuo noted that the delay engendered by the lack of integration "has slowed down our cross-sell motion," and "resulted in lower professional services and subscription revenue in the quarter as well as tempered expectations going forward." These results had caused the Company to make "a course correction in [its] approach" and Defendant Tzuo reassured listeners that "the integration of our two flagship products is critically important to us and our customers' success. So I'm personally spending a lot of my time here to drive this to completion." Still, Defendant Tzuo estimated that a solution to the integration problem would not be completed until the quarter ended October 31, 2019.

193.    Regarding sales, Defendant Tzuo admitted that "we need to improve our sales execution" and that "newer [sales] reps were less than half as productive than our more experienced reps." Defendant Tzuo laid out a remediation plan involving placing newer sales representatives under more experienced ones, improving the Company's pipeline process, and changing sales leadership, as evidenced by the departure of Defendant Diouane.

194.    In response to this news, one analyst on the conference call asked: "I sort of get the integration of Billings and RevPro and how that could sort of slow some things down, but . . .I mean you bought Leeyo two years ago. So I'd just like, it's hard, like how could it not be integrated?" To this Defendant Tzuo responded that Zuora "didn't really have time and the resources to focus on the integration between the two, until after the [ASC] 606 [wave] was complete." Due to this delay, Zuora "didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end a false direction."

195.    As analysts and investors absorbed the disclosures, Zuora's share price declined by $5.91 per share (almost 30%) on a trading volume of nearly 19 million, from a close of $19.90 per share on May 30, 2019 to close at $13.99 per share on May 31, 2019. The next trading day, Zuora's stock fell another $0.63 to close at $13.26 per share on June 3, 2019.

### Subsequent Developments

196.    On June 5, 2019, Zuora held an Investor Session at which Defendant Tzuo elaborated further on the integration issue. Defendant Tzuo noted that subscription models were "very different" from "traditional ERP systems [that] are order-based systems[.]" He continued that "RevPro is used to importing orders [from traditional ERP systems] because it grabs an order from SAP, it grabs an order from Oracle because that's all it had." According to Defendant Tzuo, initially the Company "tried to make our billing system produce an order that look like an ERP system." Defendant Tzuo acknowledged that these efforts were unsuccessful and "silly" and that the issues with these efforts "probably could have [been] caught [] a little bit earlier." Defendant Tzuo stated that an integration would be completed soon but that it was currently only being tested on four customers and was not live.

197.    On August 28, 2019, on an earnings call, Defendant Tzuo provided an update stating that the integration was "completed and delivered" but that Zuora had not fully implemented it, having only "restarted [] a number of previously paused implementations[.]"

198.    On September 10, 2019, at the Deutshce Bank Technology Conference, Zuora's Vice President of Investor relations stated: "[L]ast year, we actually spent some time doing the integration. So making sure that people that have our Billing product could also buy RevPro and have a clean integration across it." He continued that: "We had some challenges going through it we highlighted on the Q1 call." He stated due to these challenges, there was a pause on implementations "until we got the integration work done." Now that the integration was completed, the Company was resuming implementations and preparing to have the integrated software go live.

199.    On October 19, 2019, the Company published a blog post on the "Knowledge Center" of its website titled: "Zuora Billing - RevPro Integration overview: Zuora Billing – RevPro Integration is in

Limited Availability." This blog post recognized the past problems the lack of integration had caused for Zuora's customers, stating:

> *If you are using both Zuora Billing and Zuora RevPro, the integration between two systems is likely to be a pain point to you. You need to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.*

(Emphasis added.)

200.    These post-Relevant Period statements reveal that Billing and RevPro were not integrated during the Relevant Period despite statements made to the contrary. Moreover, the statements show that Defendant Tzuo and the other Individual Defendants knew about the lack of integration during the Relevant Period, the Company's earlier "silly" efforts to fix the problem, and Zuora's customers' experiences in trying to figure out workarounds for the unintegrated software. Yet, despite this knowledge, the Individual Defendants did not disclose the existence of this issue during the Relevant Period and instead made and caused the Company to make false and misleading statements about it.

## DAMAGES TO ZUORA

201.    As a direct and proximate result of the Individual Defendants' conduct, Zuora has lost and expended, and will lose and expend, many millions of dollars.

202.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

203.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

204.    As a direct and proximate result of the Individual Defendants' conduct, Zuora has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

205.    Plaintiffs bring this action derivatively and for the benefit of Zuora to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zuora, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act and the Securities Act, as well as the aiding and abetting thereof.

206.    Zuora is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

207.    Plaintiffs are, and have continuously been at all relevant times, shareholders of Zuora. Plaintiffs will adequately and fairly represent the interests of Zuora in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

208.    Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

209.    Demand futility for an amended complaint is examined with respect to the membership of the Board at the time the original complaint was filed if the claims asserted in the amended complaint were "validly in litigation" due to the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778–79 (Del. 2006) ("[A] plaintiff does not need to make a demand before amending a derivative complaint where a new board of directors comes into power, if the amended derivative claims were "validly in litigation" before the new board assumed control."). "'[V]alidly in litigation' means a proceeding *that can* or has survived a motion to dismiss." (Emphasis added.)

210.    Because the claims asserted in this complaint are "validly in litigation" due to the original, first-filed complaint, demand futility is analyzed at the time that complaint was filed.

211.    A pre-suit demand on the Board of Zuora was futile and is, therefore, excused. At the time of filing of this action, the Board consisted of the following seven Individual Defendants: Defendants Tzuo, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil (collectively, the "Directors").

Plaintiffs need only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

212.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $21.8 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

213.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

214.    Additional reasons that demand on Defendant Tzuo is futile follow. Defendant Tzuo is the cofounder of the Company and has served as the Company's Chairman and CEO since its inception. The Company provides Defendant Tzuo with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Defendant Tzuo was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, many of which he personally made statements in, and the 2019 10-K and 1Q19 10-Q, 2Q19 10-Q, and 3Q19 10-Q which he signed and/or signed SOX certifications for. The 2019 Proxy Statement was solicited on his behalf and contained false and misleading elements that contributed to the reelection of Defendants Haley and Yesil. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In violation of the Code of

Conduct, he failed to uphold his duties as a Senior Financial Officer to ensure that the Company remained in compliance with relevant laws and regulations surrounding Zuora's public statements. Moreover, Defendant Tzuo is a defendant in the Securities Class Actions due to his misconduct. For these reasons, too, Defendant Tzuo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Fenton is futile follow. At the time this action was commenced, Defendant Fenton had served as a Company director since December 2007 and served as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fenton signed, and thus personally made the false and misleading statements in, the 2019 10-K. The 2019 Proxy Statement was solicited on his behalf and contained false and misleading elements that contributed to the reelection of Defendants Haley and Yesil. Moreover, Defendant Fenton's misconduct has also led to his being named a defendant in the State Securities Class Action. For these reasons, too, Defendant Fenton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman has served as a Company director since February 2016 and serves as Chair of the Audit Committee. Defendant Goldman receives handsome compensation, including $187,483 during the fiscal year ended January 31, 2019. As Chair of the Audit Committee and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Goldman signed, and thus personally made the false and misleading statements in, the 2019 10-K. The 2019 Proxy Statement was solicited on his behalf and contained false and misleading elements that contributed to the reelection of Defendants Haley and Yesil. His insider sale

before the fraud was exposed, which yielded $697,200 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Goldman's misconduct has also led to his being named a defendant in the State Securities Class Action. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Haley is futile follow. Defendant Haley has served as a Company director since October 2010 and serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Haley signed, and thus personally made the false and misleading statements, in the 2019 10-K. The 2019 Proxy Statement was solicited on his behalf and contained false and misleading elements that contributed to his reelection and the reelection of Defendant Yesil. Moreover, Defendant Haley's misconduct has also led to his being named a defendant in the State Securities Class Action. For these reasons, too, Defendant Haley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Pressman is futile follow. Defendant Pressman has served as a Company director since November 2008 and serves on the Compensation Committee and Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Pressman signed, and thus personally made the false and misleading statements, in the 2019 10-K. The 2019 Proxy Statement was solicited on his behalf and contained false and misleading elements that contributed to the reelection of Defendants Haley and Yesil. His insider sales before the fraud was exposed, which yielded $39,314 in proceeds, demonstrates his motive in facilitating and participating in the fraud.

Moreover, Defendant Pressman's misconduct has also led to his being named a defendant in the State Securities Class Action. For these reasons, too, Defendant Pressman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.     Additional reasons that demand on Defendant Volpi is futile follow. At the time this action was commenced, Defendant Volpi had served as a Company director since November 2011 and served as a member of the Audit Committee. As an Audit Committee member and trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Volpi signed, and thus personally made the false and misleading statements, in the 2019 10-K. The 2019 Proxy Statement was solicited on his behalf and contained false and misleading elements that contributed to the reelection of Defendants Haley and Yesil. His insider sales before the fraud was exposed, which yielded at least $21 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Volpi's misconduct has also led to his being named a defendant in the State Securities Class Action. For these reasons, too, Defendant Volpi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.     Additional reasons that demand on Defendant Yesil is futile follow. Defendant Yesil has served as a Company director since May 2017. She also serves as Chair of the Nominating and Corporate Governance Committee. Defendant Yesil receives handsome compensation, including $189,358 during the fiscal year ended January 31, 2019. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Yesil signed, and thus personally made the false and misleading statements in, the 2019 10-K. The 2019 Proxy Statement was solicited on her behalf and contained false and misleading elements that contributed to

her reelection and the reelection of Defendant Haley. Moreover, Defendant Yesil's misconduct has also led to her being named a defendant in the State Securities Class Action. For these reasons, too, Defendant Yesil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

221.   Additional reasons that demand on the Board is futile follow.

222.   As described above, three of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Goldman, Pressman, and Volpi collectively received proceeds of over $21.8 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

223.   Demand in this case is excused because the Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Tzuo and Yesil worked closely together at SalesForce as core members of the newly founded Company from 1999 to 2005. Defendants Fenton and Volpi also have multiple business relationships, having both served on the Board of Directors of Hortonworks, Inc. from 2011 to January 2019 and both currently serve on the board of Elastic N.V. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

224.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act and the Securities Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

225.    Zuora has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zuora any part of the damages Zuora suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

226.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

227.    The acts complained of herein constitute violations of fiduciary duties owed by Zuora officers and directors, and these acts are incapable of ratification.

228.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zuora. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zuora, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

229.    If there is no directors' and officers' liability insurance, then the Directors will not cause Zuora to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

230.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### The Present Board

231.    In the event that the Court should determine that demand futility should instead be analyzed at the time of filing of this Complaint, demand would nevertheless be excused as futile.

232.    At present, the Board consists of the following nine individuals: Defendants Goldman, Haley, Pressman, Tzuo, and Yesil (the "Director Defendants") and non-parties Omar Abbosh, Sarah Bond, Laura Clayton McDonnell, and Amy Guggenheim Shenkan (collectively with the Director Defendants, the "Present Directors"). Plaintiffs need only allege demand futility as to five of nine Present Directors.

233.    Demand is excused as to the five Director Defendants for the reasons described *supra* in ¶¶ 212–14, 216–18, 220, and 222–29.

234.    All five Director Defendants face a substantial likelihood of liability for their misconduct which has rendered them all defendants in the State Securities Class Action. Plaintiffs in that case overcame a demurrer on October 15, 2020 and obtained class certification on October 14, 2021.

235.    In addition, the Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Present Directors have still not filed any lawsuits against the Individual Defendants or any others who were responsible for the wrongful conduct at issue to attempt to recover for the Company any part of the damages the Company suffered and will continue to suffer thereby. However, this is unsurprising given that the Director Defendants still constitute a majority of the Board. Given the Present Directors inaction to this point, the Present Directors are not independent or disinterested, and any demand upon the Present Directors would be futile.

236.    Thus, for all of the reasons set forth above, all of the Present Directors, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the present Board is excused as futile.

## FIRST CLAIM

### Against the Directors for Violations of Section 14(a) of the Exchange Act

237.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

238.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

239.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

240.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls.

241.   The Directors also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to incentivize "the growth of sustainable long-term value for [Zuora's] stockholders," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

242.   The 2019 Proxy Statement also made references to the Code of Conduct, which required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2019 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

243.   In the exercise of reasonable care, the Directors should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors and ratification of an independent auditor.

244.   The false and misleading elements of the 2019 Proxy Statement led to the reelection of Defendants Haley and Yesil, which allowed them to continue breaching their fiduciary duties to Zuora.

245.   The Company was damaged as a result of the Directors' material misrepresentations and omissions in the 2019 Proxy Statement.

246.   Plaintiffs on behalf of Zuora have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

247.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

248.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zuora's business and affairs.

249.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

250.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zuora.

251.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls. In further breach of their fiduciary duties owed to Zuora, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) despite representations to the contrary, Billing and RevPro were not integrated; (2) Billing and RevPro not being integrated led to numerous customer complaints and a loss of business, which would significantly and adversely affect the Company; (3) RevPro's customer base was primarily limited to clients attempting to navigate new accounting standards; (4) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASC 606; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

252.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

253.    In breach of their fiduciary duties, five of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

254.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

255.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

256.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

257.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zuora has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

258.    Plaintiffs on behalf of Zuora have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

259.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

260.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zuora.

261.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Zuora that was tied to the performance or artificially inflated valuation of Zuora, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

262.    Plaintiffs, as shareholders and representatives of Zuora, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

263.    Plaintiffs on behalf of Zuora have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

264.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

265.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

266.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

267.    Plaintiffs on behalf of Zuora have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

268.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

269.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zuora, for which they are legally responsible.

270.    As a direct and proximate result of the Individual Defendants' abuse of control, Zuora has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Zuora has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

271.    Plaintiffs on behalf of Zuora have no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

272.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

273.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zuora in a manner consistent with the operations of a publicly-held corporation.

274.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zuora has sustained and will continue to sustain significant damages.

275.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

276.     Plaintiffs on behalf of Zuora have no adequate remedy at law.

### SEVENTH CLAIM

**Against Defendants Tzuo and Sloat for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

277.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

278.     Zuora, Defendant Tzuo, and Defendant Sloat are named as defendants in the Federal Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Federal Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Tzuo's and Sloat's willful and/or reckless violations of their obligations as officers and/or director of Zuora.

279.     Defendants Tzuo and Sloat, because of their positions of control and authority as CEO and CFO of Zuora, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zuora, including the wrongful acts complained of herein and in the Federal Securities Class Action.

280.     Accordingly, Defendants Tzuo and Sloat are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

281.     As such, Zuora is entitled to receive all appropriate contribution or indemnification from Defendants Tzuo and Sloat.

### EIGHTH CLAIM

**Against Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil for
Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

282.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

283.    As a result of the conduct and events alleged above, the Company is a defendant in the State Securities Class Action brought on behalf of Zuora shareholders in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

284.    Federal law provides Zuora with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

285.    The plaintiffs in the State Securities Class Actions allege that the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

286.    Zuora is the registrant for the IPO. Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil were responsible for the contents and dissemination of the Registration Statement.

287.    As issuer of the shares, Zuora is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the State Securities Class Action.

288.    The plaintiffs in the State Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

289.    Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil, because of their positions of control and authority as officers and directors of Zuora, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zuora, including the wrongful acts complained of herein and in the State Securities Class Actions.

290.    Accordingly, Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

291.    As such, Zuora is entitled to receive all appropriate contribution or indemnification from Defendants Tzuo, Sloat, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil.

### **PRAYER FOR RELIEF**

292.    FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Zuora, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zuora;

(c)    Determining and awarding to Zuora the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Zuora and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zuora and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zuora to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Zuora restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

    Plaintiffs hereby demand a trial by jury.


Dated: March 15, 2022              Respectfully submitted,

                         **THE ROSEN LAW FIRM, P.A.**

                         */s/ Laurence M. Rosen*
                         Laurence M. Rosen (SBN 219683)
                         355 S. Grand Avenue, Suite 2450
                         Los Angeles, CA 90071
                         Telephone: (213) 785-2610
                         Facsimile: (213) 226-4684
                         Email: lrosen@rosenlegal.com

                         **THE BROWN LAW FIRM, P.C.**
                         Timothy Brown
                         767 Third Avenue
                         New York, NY 10017
                         Telephone: (516) 922-5427
                         Facsimile: (516) 344-6204
                         Email: tbrown@thebrownlawfirm.net

                         *Co-Lead Counsel for Plaintiffs*

## <u>VERIFICATION</u>

I, Andrew Lichter am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2022.

Andrew Lichter

DocuSign Envelope ID: 4C0FF17E-4B69-4790-A620-8391DE62E10C

## **VERIFICATION**

I, Keith Beaven am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of _____, 2022.

2/15/2022

Keith Beaven